# KNOTT *v.* BOTANY MILLS.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND
CIRCUIT.

No. 5.   Argued October 12, 13, 1899.—Decided October 22, 1900.

Bales of wool were stowed on a steamship, with proper dunnage, between
decks and forward of a temporary wooden bulkhead.   At a subsequent
port, wet sugar (from which there is always drainage) was stowed aft of
that bulkhead, with proper dunnage, but without any provision for car-
rying off the drainage in case it ran forward.   The ship was then down
by the stern, and all drainage from the sugar was carried off by the scup-
pers.   At a third port, other cargo was discharged, so as to trim the ves-
sel two feet by the head; and the drainage from the sugar found its way
through the bulkhead, and damaged the wool, through negligence of
those in charge of the ship and cargo.   *Held* : That the damage to the
wool was through fault in the proper loading or stowage of the cargo,
within section 1 of the act of February 13, 1893, c. 105, known as the
Harter Act, and not from fault in the navigation or management of the
vessel, within section 3 of that act.

The words, in section 1 of the Harter Act, "any vessel transporting mer-
chandise or property from or between ports of the United States and for-
eign ports," include a foreign vessel transporting merchandise from a
foreign port to a port of the United States; and such a vessel and its
owner are therefore liable for negligence in proper loading or stowage
of the cargo, notwithstanding any stipulations in the bill of lading that
they shall be exempt from liability for such negligence, and that the con-
tract shall be governed by the law of the ship's flag.

THE case is stated in the opinion of the court.

*Mr. J. Parker Kirlin* for the petitioner.

*Mr. Wilhelmus Mynderse* for the respondents.   *Mr. Law-
rence Kneeland* filed a brief for same.

MR. JUSTICE GRAY delivered the opinion of the court.

The Botany Worsted Mills, a corporation of New Jersey, and
Winter and Smillie, a firm of merchants in the city of New York,

respectively owners of two separate lots of bales of wool, shipped at Buenos Ayres for New York on board the steamship Portuguese Prince, severally filed libels in admiralty *in personam* in the District Court of the United States for the Southern District of New York, against James Knott, the owner of the vessel, to recover for damage caused to the wool by contact with drainage from wet sugar which also formed part of her cargo.

The Portuguese Prince was a British vessel, belonging to a line trading between New York and ports in the River Plata, Brazil, and the West Indies, loading and discharging cargo and having a resident agent at each port. The bills of lading of the wool, signed at Buenos Ayres, December 21, 1894, gave her liberty to call at any port or ports to receive and discharge cargo, and for any other purpose whatever; and purported to exempt the carrier from liability for "negligence of masters or mariners;" "sweating, rust, natural decay, leakage or breakage, and all damage arising from the goods by stowage, or contact with, or by sweating, leakage, smell or evaporation from them;" "or any other peril of the seas, rivers, navigation, or of land transit, of whatsoever nature or kind; and whether any of the perils, causes or things above mentioned, or the loss or injury arising therefrom, be occasioned by the wrongful act, default, negligence, or error in judgment of the owners, masters, officers, mariners, crew, stevedores, engineers and other persons whomsoever in the service of the ship, whether employed on the said steamer or otherwise, and whether before, or after, or during the voyage, or for whose acts the shipowner would otherwise be liable; or by unseaworthiness of the ship at the beginning, or at any period of the voyage, provided all reasonable means have been taken to provide against such unseaworthiness." Each bill of lading also contained the following clause: "This contract shall be governed by the law of the flag of the ship carrying the goods, except that general average shall be adjusted according to York-Antwerp Rules, 1890."

The facts of the case are substantially undisputed. The bales of wool of the libellants were taken on board at Buenos Ayres, December 21-24, 1894, and were stowed on end, with proper dunnage, between decks near the bow, and forward of a tem-

porary wooden bulkhead, which was not tight. The vessel, after touching at other ports, touched on February 19, 1895, at Pernambuco, and there took on board two hundred tons of wet sugar, (from which there is always drainage,) which was stowed, with proper dunnage, between decks, aft of the wooden bulkhead. At that time the vessel was trimmed by the stern, and all drainage from the sugar, flowing aft, was carried off by the scuppers, which were sufficient for the purpose when the vessel was down by the stern, or on even keel in calm weather. There was no provision for carrying off the drainage in case it ran forward. She discharged other cargo at Para; and on March 10, when she left that port, she was two feet down by the head. She continued in this trim until she took on additional cargo at Port of Spain, where the error in trim was corrected, and she left that port on March 18, loaded one foot by the stern. It was agreed by the parties that there was no damage to the wool by sugar drainage until she was trimmed by the head at Para; that the wool was damaged, by sugar drainage finding its way through the bulkhead and reaching the wool, at Para, or between Para and Port of Spain, and not afterwards; that, after she was again trimmed by the stern at Port of Spain, none of the drainage from the sugar found its way forward; and that the court might draw inferences.

The District Court entered a decree for the libellants. 76 Fed. Rep. 582. That decree was affirmed by the Circuit Court of Appeals. 51 U. S. App. 467. The appellant then obtained a writ of certiorari from this court. 168 U. S. 711.

Before the act of Congress of February 13, 1893, c. 105, (27 Stat. 445,) known as the Harter Act, it was the settled law of this country, as declared by this court, that common carriers, by land or sea, could not by any form of contract exempt themselves from responsibility for loss or damage arising from negligence of their servants, and that any stipulation for such exemption was void as against public policy; although the courts in England and in some of the States held otherwise. *Railroad Co.* v. *Lockwood,* 17 Wall. 357; *Liverpool Steam Co.* v. *Phœnix Ins. Co.,* 129 U. S. 397; *Compania La Flecha* v. *Brauer,* 168 U. S. 104, 117, 118. In many lower courts of the United States

it has been held, independently of the Harter Act, that a stipulation that a contract should be governed by the law of England in this respect was void, and could not be enforced in a court of the United States; but the point has not been decided by this court. Nor is it necessary for us now to decide that point, because these bills of lading were issued since the Harter Act, and we are of opinion that the case is governed by the express provisions of that act.

Upon the facts of this case, there can be no doubt that the ship was seaworthy, and that the damage to the wool was caused by drainage from the wet sugar through negligence of those in charge of the ship and cargo. The questions upon which the decision of the case turns are two:

First. Whether this damage to the wool was "loss or damage arising from negligence, fault or failure in proper loading, stowage, custody, care or proper delivery" of cargo, within the first section of the Harter Act; or was "damage or loss resulting from faults or errors in navigation or in the management of said vessel," within the third section of that act?

Second. Do the words, in the first section, "any vessel transporting merchandise or property from or between ports of the United States and foreign ports," include a foreign vessel transporting merchandise from a foreign port to a port of the United States?

Section 1 of that act is as follows: "It shall not be lawful for the manager, agent, master or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant or agreement whereby it, he or they shall be relieved from liability for loss or damage arising from negligence, fault or failure in proper loading, stowage, custody, care or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import, inserted in bills of lading or shipping receipts, shall be null and void and of no effect." This section, in all cases coming within its provisions, overrides and nullifies any such stipulations in a bill of lading. *Calderon* v. *Atlas Steamship Co.*, 170 U. S. 272.

By section 3, on the other hand, " if the owner of any vessel transporting merchandise or property to or from any port in the United States" shall exercise due diligence to make her in all respects seaworthy and properly manned, equipped and supplied, neither the vessel nor her owner, agent or charterer " shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel," etc. This section does but relax the warranty of seaworthiness in the particulars specified in the section. *The Carib Prince*, 170 U. S. 655; *The Irrawaddy*, 171 U. S. 187.

We fully concur with the courts below that the damage in question arose from negligence in loading or stowage of the cargo, and not from fault or error in the navigation or management of the ship—for the reasons stated by the District Judge, and approved by the Circuit Court of Appeals, as follows:

" The primary cause of the damage was negligence and inattention in the loading or stowage of the cargo, either regarded as a whole, or as respects the juxtaposition of wet sugar and wool bales placed far forward. The wool should not have been stowed forward of the wet sugar, unless care was taken in the other loading, and in all subsequent changes in the loading, to see that the ship should not get down by the head. There was no fault or defect in the vessel herself. She was constructed in the usual way, and was sufficient. But on sailing from Para she was a little down by the head, through inattention, during the changes in the loading, to the effect these changes made in the trim of the ship and in the flow of the sugar drainage. She was not down by the head more than frequently happens. It in no way affected her sea-going qualities; nor did the vessel herself cause any damage to the wool. The damage was caused by the drainage of the wet sugar alone. So that no question of the unseaworthiness of the ship arises. The ship herself was as seaworthy when she left Para, as when she sailed from Pernambuco. The negligence consisted in stowing the wool far forward, without taking care subsequently that no changes of loading should bring the ship down by the head. I must, therefore, regard the question as solely a question of negligence in the stowage and disposition of cargo, and of damage consequent

thereon, though brought about by the effect of these negligent changes in loading on the trim of the ship." " The change of trim was merely incidental, the mere negligent result of the changes in the loading, no attention being given to the effect on the ship's trim, or on the sugar drainage." " Since this damage arose through negligence in the particular mode of stowing and changing the loading of cargo, as the primary cause, though that cause became operative through its effect on the trim of the ship, this negligence in loading falls within the first section. The ship and owner must, therefore, answer for this damage, and the third section is inapplicable." 76 Fed. Rep. 583–585 ; 51 U. S. App. 473.

In *The Glenochil* (1896) Prob. 10, on which the appellant much relied, the negligence which was held to be within the third section of the Harter Act was, as said by Sir Francis Jeune, " a mismanagement of part of the appliances of the ship, and mismanagement which arose because it was intended to do something for the benefit of the ship, namely, to stiffen her, the necessity for stiffening arising because part of her cargo had been taken out of her." He pointed out that the first and third sections of the act might be reconciled by the construction, " first, that the act prevents exemptions in the case of direct want of care in respect of the cargo, and secondly, the exemption permitted is in respect of a fault primarily connected with the navigation or management of the vessel and not with the cargo." And he added that the court had had the same sort of question before it in the case of *The Ferro*, (1893) Prob. 38, and he adhered to what he there said, " that mere stowage is an altogether different matter from the management of the vessel." And Sir Gorell Barnes delivered a concurring opinion to the same effect.

The like distinction was recognized by this court in the recent case of *The Silvia*, 171 U. S. 462, 466.

The remaining question is whether the first section of the Harter Act applies to a foreign vessel on a voyage from a foreign port to a port in the United States.

The power of Congress to include such cases in this enactment cannot be denied in a court of the United States. The point in

controversy is whether, upon the proper construction of the act, Congress has done so. That the third section does extend to such a vessel on such a voyage has been already decided by this court. *The Silvia*, above cited; *The Chattahoochee*, 173 U. S. 540, 550, 551.

It is true that the words of that section are not exactly the same in this respect, being "any vessel transporting merchandise or property to or from any port in the United States," whereas the corresponding words in the first section are "any vessel transporting merchandise or property from or between ports of the United States and foreign ports."

But the two phrases, as applied to the subject-matter, are precisely equivalent, and are both equally applicable to a foreign voyage that ends, and to one that begins, in this country. In their usual and natural meaning, the words "from any port in the United States" include all voyages, whether domestic or foreign, which begin in this country; the words "to any port in the United States" include all voyages, whether domestic or foreign, which end in this country; and the words "between ports of the United States and foreign ports" include all foreign voyages which either begin or end here. The words of the third section, "to or from any port in the United States" express in the simplest and most direct form the intention to include voyages hither as well as voyages hence. And we find insuperable difficulty in the way of giving a different meaning to the words of the first section, "from or between ports of the United States and foreign ports." The words "from ports of the United States" would of themselves be sufficient to cover all voyages which begin here, whether they end in a domestic or in a foreign port; and the words "between ports of the United States and foreign ports" no more appropriately designate foreign voyages beginning here, than such voyages beginning abroad. The phrase of the first section is slightly elliptical; but it appears to us to have exactly the same meaning as if the ellipsis had been supplied by repeating the words "ports of the United States," so as to read "any vessel transporting merchandise or property from ports of the United States, or between ports of the United States and foreign ports." And

no reason has been suggested why a foreign vessel should come within the benefit of the third section relaxing the warranty of seaworthiness, and not come within the prohibition of the first section affirming the unlawfulness of stipulations against liability for negligence.

Attention was called at the bar to the fact that in the act, as originally passed by the House of Representatives, the words of the third section were "any vessel transporting merchandise or property between ports in the United States of America and foreign ports," and that for those words the Senate substituted the words as they now stand in the act; and it was argued that the change in this section, leaving unchanged the corresponding clauses in the first and other sections of the act, showed that those sections were not supposed or intended to include vessels bound from foreign ports to ports of the United States. But the argument fails to notice that the third section, as it originally stood, did not contain the words "from or," but covered only voyages "between ports in the United States and foreign ports;" and the more reasonable inference is that the change was made for the purpose of bringing domestic voyages within this section. See 24 Congr. Rec. 147–149, 173, 1181, 1291, 1292.

Attention was also called to the fourth section of the act, which makes it the duty of the owner, master or agent of "any vessel transporting merchandise or property from or between ports of the United States" to issue to shippers bills of lading containing a certain description of the goods; and to the fifth section, which provides that, "for a violation of any of the provisions of this act, the agent, owner or master of the vessel guilty of such violation, and who refuses to issue on demand the bill of lading herein provided for, shall be liable to a fine not exceeding two thousand dollars," and the amount of the fine and costs shall be a lien upon the vessel, and she may be libelled therefor in any District Court of the United States within whose jurisdiction she may be found. It was argued that this provision imposing a penalty would cover a refusal to give a bill of lading without the clauses prohibited by the first section; and could not extend to acts done in a foreign port out of the

jurisdiction of the United States. But whether that be so or not, (which we are not required in this case to decide,) it affords no sufficient reason for refusing to give full effect, according to what appears to us to be their manifest meaning, to the positive words of the first section, which enact, as to "any vessel." transporting merchandise or property "between ports of the United States and foreign ports," that all stipulations relieving the carrier from liability for loss or damage arising from negligence in the loading or stowage of the cargo shall not only be unlawful, but "shall be null and void and of no effect."

This express provision of the act of Congress overrides and nullifies the stipulations of the bill of lading that the carrier shall be exempt from liability for such negligence, and that the contract shall be governed by the law of the ship's flag.

*Decree affirmed.*