## DOMINGUS FERREIRA *vs.* THE AMERICAN STEAMSHIP ARIZONAN.

### April 9, 1910.

*Common carrier—Liability for its negligence:* A common carrier cannot exempt itself by contract from the consequences of its own negligence.

*Same—Carrier of live stock—Duty of:* It is the duty of a carrier of live stock to provide a safe and proper place for animals intrusted to it for transportation.

*Same—Undertaking of shipper to feed and care for animals:* A common carrier by sea is liable for the death of a horse which resulted from an inadequate number of cleats in the floor of a stall notwithstanding the shipper accompanied the animal and undertook to feed and care for it on the voyage.

*In Admiralty:* Libel *in rem* and *in personam* for damages for causing the death of a horse.

*George A. Davis,* Proctor for Libelant.
*Smith, Warren & Hemenway,* Proctors for Libellee.

ROBERTSON, J. The libelant claims damages in the sum of six hundred ($600.00) dollars for the loss of a mare which was being transported from San Francisco to Honolulu upon the steamship Arizonan.

The evidence shows the following facts: The American-Hawaiian Steamship Company, at San Francisco, California,

on the 20th day of February, 1909, agreed with the libelant, in consideration of the payment of certain freight, to carry five horses by its steamer Arizonan to Honolulu.

Said steamer left San Francisco on the morning of the 21st of February, 1909, the horses being carried in stalls on deck. During the afternoon of that day the steamer encountered a fresh northwest gale and moderately high seas which caused her to roll heavily and to take water over the weather side. The vessel was put at half speed. In the evening the weather began to moderate and the ship rolled less. At about seven o'clock the mare in question fell but was put on her feet again shortly after. At eleven o'clock she fell again and broke one of her legs. The next morning she was shot and thrown overboard by orders of the captain. The captain testified that the mare was what is known as "a poor shipper," meaning an animal that is addicted to lying down. But it does not appear that this opinion was based on any actual observation of his own.

The libelant was also aboard the steamer, having signed the ship's articles as "cattle-man," on the understanding that he would feed and care for the animals during the voyage.

Shortly after leaving port the libelant spoke to the captain and also the mate of the vessel, telling them that the horses' stalls should have some canvas put over them to protect the horses from the weather and that some additional cleats should be placed on the floors of the stalls to afford a footing for the animals. The captain referred him to the mate, and the latter, after some delay, "gave him the carpenter and one seaman and told him to go ahead, that these two men were at his service and to go ahead until he had finished." The stalls were then boarded up on the weather side and canvas put over them but no cleats were put on the floors until the next day.

The controversy hinges principally on the condition of the floor of the stall in which the mare was injured.

It is alleged in the libel that, "under and by virtue of said contract and agreement so entered into as aforesaid between the owner of the said steamship Arizonan and the said libelant,

it became and was the bounden duty of the said steamship, the owners thereof, the master of the said steamship and all other officers and servants and agents to take proper precaution and care to set apart a space on board the said steamship so that said mare would be carried and conveyed safely to the port of Honolulu; but the said steamship, the owner, master, servants and agents, not regarding their duty in that behalf, and in violation of their contract and agreement so entered into as aforesaid, placed said mare on the main deck of said steamship on the starboard side thereof and allowed said mare to be placed on a portion of the floor of said steamship without nailing and putting down on the place where she was allowed to stand and placed by the officers of said steamship, cleats, so that said mare, when said steamship began to pitch and roll, would have a grip so that she would not fall down; and the master of the said vessel agreed with the said libelant as the agent of the owners and the said vessel, to have the said cleats nailed to the floor of said vessel upon which said mare was standing, and gave orders to the carpenter to fasten said cleats upon the floor and fix up a stable for her; but the said carpenter, wholly neglecting his duty in that behalf, did not so place said cleats upon said floor nor take ordinary and proper care and precaution to prevent said valuable mare from falling; and on the evening of Sunday, the 21st day of February, after the said vessel had proceeded on her voyage and was upon the high seas, she commenced to roll and pitch and by reason of the neglect of duty of the agents and servants of the said steamship, and in violation of the contract to carry the said mare safely and to use care and caution and to so place the said cleats and arrange the stalls for the said mare, the said mare fell down and was unable to rise because said cleats were not so provided as aforesaid; and while upon the floor of said steamship, the leg of the said mare was broken."

The captain and mate both testified that the stalls in which the libelant's horses were placed had been built in San Francisco under the supervision of the government's representative

and according to the official regulations.    The regulations referred to are those of the United States Department of Agriculture, which provide that "Foot locks shall be of good sound spruce, hard pine, oak, or other hard wood, size 2 by 4 inches, laid flat side down and fore-and-aft, placed 12 inches, 14 inches, 2 feet 2 inches, and 14 inches apart, the first one distant 12 inches from the inside of the foot-board," also that, "each horse must be allowed a space of 2 feet 6 inches in width by 8 feet in depth."

These witnesses compared the stalls in which the libelant's horses were placed with those in which some other horses and mules, which were also being transported on the steamer, were placed, saying that all the stalls were built alike.    But the captain, on cross-examination, stated that the cleats in the stalls were about four feet apart.  That statement shows that the above quoted requirements as to cleats, or "foot locks," had not been complied with, and it corroborates the testimony of the libelant who said that the stalls in which his horses were placed each contained only two cleats which were four or four and one-half feet apart.    The libelant testified to having had some previous experience in the matter of the transportation of horses by sea and said that such stalls usually contained four cleats placed about one foot apart.    The inference to be drawn from the rules prescribed by the Department of Agriculture is that such a number of cleats is considered necessary to the safety of the animals.

The libelant also testified that he had stalls of his own on the steamer but that those stalls were taken and used for other horses while his own were placed in the stalls above referred to.    His testimony in this respect was not contradicted.    He further testified that the stalls, other than those in which his horses were placed, each had four cleats.    This was contradicted by the officers of the ship.

The condition of the stalls, other than that in which the accident happened, is, I think, of no great importance.

The first question is, whether, under the circumstances, any

legal liability is fixed upon the libellee. There seems to be no dispute between the parties as to the legal principles applicable to such cases as this.

Counsel for the libellee refers to Moore on Carriers, chap. 18, sec. 10, where the following statements are found: "The general rule maintained by all the authorities is that carriers of live stock are liable absolutely for loss of or injury to stock intrusted to them for transportation, like other common carriers, unless the loss or injuries were occasioned by the act of God, or the public enemy, or the negligence of the shipper, except that they are not liable for loss or injury caused by the 'proper vice' or natural propensities of the animals themselves, and not by any negligence on the part of the carriers. * * * The carrier is bound to exercise reasonable care to prevent loss or injury from these causes, and it is not excusable from liability for loss or injuries so resulting which might have been prevented by it by the exercise of ordinary care. In order to relieve it from liability, it must appear that the vice or natural propensities of the animal was the sole proximate cause of the loss or injury. Unless it so appears, the carrier is liable as an insurer, even in cases where no negligence on its part is shown. * * * The carrier is not an insurer against loss or injury due to the negligence of the shipper, or his servants, where the shipper undertakes to take charge of and care for his own stock."

These propositions, except the last, substantially represent the argument of counsel for the libelant. Citation of further authority would, therefore, seem to be unnecessary.

It is not contended that the loss of the mare resulted from an act of God, or the public enemy, but it is claimed that it was attributable either to the negligence of the shipper or to the natural propensities of the animal. The evidence does not sustain either claim.

The undertaking of the shipper to feed and care for his horses did not absolve the carrier from its duty to provide a safe and adequate stall for the mare.

"A carrier of live stock is bound to provide cars properly constructed, of sufficient strength, safe, fit and suitable under existing conditions for the transportation of the stock tendered for shipment, due consideration being given to the kind, character, and value of the stock, and to exercise due care to carry safely." *Moore on Carriers,* chap. 18, sec. 3.   See also, *The Brantford City,* 29 Fed. 373; *Betts v. Railroad,* 92 Iowa 343; *Evans v. Railroad,* 111 Mass. 142.

The evidence indicates that the officers of the ship did not consider that the libelant had assumed full responsibility for the care of the horses, or that his presence on the steamer absolved the carrier from the duty of seeing to their safety.   In response to a question referring to the first fall sustained by the mare, the mate said, "One of the ship's men called me. Mr. Ferreira came out.   We wanted to raise her and Ferreira didn't want the animal raised, he wanted her to lay down, said that it was easier.   I told him 'No,' that wouldn't do, the horse might be kicked by the horses in the next stalls, so he concluded to let me raise her, and we raised the horse."

The claimed natural propensity of the mare to lie down was not clearly proven, and even if it had been, there was no showing of any steps having been taken by the carrier to provide such a stall as would tend to prevent injury resulting from the vice.

The bill of lading provided that "it is hereby understood and agreed by the said shipper that the said animals while on board the said steamer are at his sole risk; and the steamer or her owners or agents are in no way liable for any damage or accident that may happen to said animals, however caused."

The document was not signed by the libelant and the evidence is that he did not see it until after the arrival of the steamer in Honolulu.

Furthermore, it is well settled that common carriers cannot by contract exempt themselves from the consequences of their own negligence.   *Hart v. Railroad,* 112 U. S. 331; *Liverpool*

*Steam Co. v. Phenix Ins. Co.,* 129 U. S. 397; *Knott v. Botany Mills,* 179 U. S. 69.

I find that the injury resulted principally, if not solely, from the lack of sufficient cleats on the floor of the stall, and without any fault of the shipper.

Under these circumstances it must be held that the carrier is responsible for the death of the mare.

The remaining question is as to the measure of damages.

On this phase of the case the evidence is not in a very satisfying state, and I regret that the matter was not given closer attention by counsel.

The libelant testified that the name of the mare was " Lady Alicia "; that she was in good condition when shipped; that she was worth six hundred dollars; that he paid six hundred dollars for her; and that he had a bill of sale for her which he undertook to produce and file.  It appears that he did subsequently file what was evidently intended for a bill of sale but it turns out to be one for a mare named " Daisy Haas."  The discrepancy was not explained.

The captain of the steamer testified that at the time the horses were shipped the libelant made a declaration or affidavit that the five horses were worth, in the aggregate, one thousand dollars, and that the bill of lading would show it.  The bill of lading contains no statement of value.

It is argued that where a shipper has placed a valuation upon his property, such valuation will control in any action against the carrier for loss.

But to the question, " Do you know, of your own knowledge, what, if any, declaration Ferreira made in regard to these animals," the captain replied, " Yes.  I know *the horses were valued* at $1,000."  It would seem from this that he did not hear or see the declaration which was supposed to have been made.

It does not appear that the freight rate was fixed with reference to any particular valuation.

The libelant denies that he made any such statement or declaration, and says that he was not asked as to the value of his horses.   The deposition of the libelant was taken on August 10, 1909, that of the captain on December 16, 1909, and that of the mate on January 27, 1910.

No attempt seems to have been made to obtain testimony in contradiction of that of the libelant as to the purchase price of the mare, at least none such was adduced.   Neither was the supposed declaration or affidavit of value produced, although ample time to obtain it had elapsed before the case was submitted to the court.   The testimony of the libelant that the mare was worth six hundred dollars will, therefore, be taken as correct.

A decree will be signed awarding the libelant damages in the sum of six hundred dollars with costs.