JAY WAI NAM et al. v. ANGLO-AMERICAN OIL CO., Limited.

(Circuit Court of Appeals, Ninth Circuit. February 17, 1913.)

No. 2,134.

SHIPPING (§ 138*)—DAMAGE TO CARGO—LIABILITY—FAULT OR ERROR IN MANAGEMENT OF VESSEL.

A tank steamer was divided by bulkheads into two rows of tanks for the carriage of oil, which were also cleaned and used for dry cargo on return trips. A main pipe connected with a pump ran through each tier of tanks, having a valve in each tank which permitted the oil to be pumped therefrom. When other cargo was stowed in the tanks, these valves were left open. On a voyage from China the vessel took on coal at a Japanese port, and, to trim the ship, it became necessary to empty a water ballast tank by means of the pump, using the main pipe. An officer was directed to close the valves in the other tanks, which was done by means of a spindle from the deck, but the valves in two tanks had become jammed or had been screwed too tight when opened, and did not close properly, allowing the water to flow in through the pipes, and injure libelant's goods stowed therein before it was discovered. Held, that the jamming of the valves was not sufficient to render the vessel unseaworthy at the commencement of the voyage as they were readily closed when the trouble was discovered; that the damage to libelant's cargo was not referable to any want of care in its protection or custody within the meaning of section 1, Harter Act Feb. 13, 1893, c. 105, 27 Stat. 445 (U. S. Comp. St. 1901, p. 2946), but, as it resulted from negligence in trimming the ship, was due to a fault or error in the management of the vessel within the meaning of section 3, for which the owner was not liable.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. § 138.*]

Appeal from the District Court of the United States for the First Division of the Northern District of California; John J. De Haven, Judge.

Suit in admiralty by Jay Wai Nam and others, copartners, doing business under the name of Ti Hung Lung & Co. against the Anglo-American Oil Company, Limited, owner of the British steamship Appalachee. Decree for respondent, and libelants appeal. Affirmed.

William Denman and Denman & Arnold, all of San Francisco, Cal., for appellants.

Edward J. McCutchen, Ira A. Campbell, and Page, McCutchen, Knight & Olney, all of San Francisco, Cal., for appellee.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge. Besides the alleged want of seaworthiness of the vessel in question, the only real question in this case is whether the damage sustained by the merchandise of the appellants which was shipped at Hongkong to San Francisco on the appellee's steamship Appalachee is properly referable to a lack of care in its proper protection and custody by the officers of the ship, or to their fault or error in the management of the vessel.

It appears that the Appalachee is a "tank" ship, engaged in the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs 1907 to date, & Rep'r Indexes

transportation of oil from this country to the Orient, returning with general cargo to San Francisco. Her cargo space is divided into 16 tanks by means of athwart-ship bulkheads and a center longitudinal bulkhead. Her machinery and boilers are located in the after part of the vessel, and immediately forward of the boilers is a cofferdam for carrying salt water ballast to trim her. In the extreme forward part of the vessel are dry cargo holds, and immediately abaft those compartments is the pumproom, in which is located the machinery for discharging the oil cargo, the cofferdam, and fans to ventilate the tanks when carrying dry cargo. The tanks are located eight on each side of the center line of the vessel, and respectively numbered, starboard and port, 1 to 8. Two eight-inch pipes, one on each side of the vessel, run along its bottom from the discharging pumps in the pumproom to the cofferdam, to which they are connected by a four-inch pipe with a nonreturn valve. Valves are fitted in each tank to the main line pipe, and are operated by spindles located on deck. To discharge oil from the tanks the valves are opened by means of a ratchet used to turn the spindles, and the oil is drawn through the main line pipe and forced out of the vessel through a discharge line by means of the pumps. When oil cargoes are carried, the tank valves are closed except during discharge. When dry cargoes are to be carried, the tanks are steamed, cleaned, and whitewashed to eradicate the smell and taint of oil, and, when cargo is stored in the tanks, the valves are kept open and periodically fresh air is forced into the tanks by means of the fan located in the pumproom. Previous to the voyage on which the damage in question occurred, the Appalachee had discharged a cargo of oil at Hankow and Shanghai, China, and at the latter port the tanks had been steamed, washed, and whitewashed, and ceiling boards laid on the bottom preparatory to loading a dry cargo for San Francisco. From Shanghai the ship went to Iloilo, Philippine Islands, and there took on sugar, which was stored in tanks Nos. 3, 4, 5, and partly filling No. 6; this certificate as to the then condition of those tanks having been made by a master mariner and marine surveyor appointed by Lloyd's agent to make such survey:

"Iloilo, P. I., 29th April, 1907.

"I hereby certify that I have this day surveyed the holds of the S/S 'Appalachee' numbered 3, 4, 5 and 6 (Port and Starboard), and found them in the following condition, viz.: Clean, and well lime washed, free from petroleum smell, and in good and fit condition to carry perishable cargo.

"Chas. James Kerr, Master Mariner & Marine Surveyor."

From Iloilo the vessel proceeded to Hongkong, and there completed her cargo with general merchandise, stowing it in tanks Nos. 1 and 2, and in the remaining space in No. 6, that of the appellants being stored in Nos. 1 and 2, the then condition of Nos. 1 and 2 being certified to as follows:

"Lloyd's Register of British & Foreign Shipping.

"Head Office, 71 Fenchurch Street, London, E. C.

"Port Hongkong, 11th May, 1907.

"This is to certify that I have surveyed the Nos. 1 & 2 Tanks of the British Tank screw steamer 'Appalachee' of London, No. 1056 in the Register

Book, after carrying petroleum in bulk and found same cleaned, limewashed and free from smell, and that I have transmitted to the Committee of Lloyd's Register of British and Foreign Shipping, London, a report stating that all repairs recommended by me have been completed to my satisfaction, and the requirements of the Society's Rules fulfilled, and that I have recommended that she be continued as classed, being fit to carry dry and perishable cargo.        Jno. Lambert, Surveyor to Lloyd's Register."

The testimony of the chief engineer of the ship appears from the record to have been very frank, and is clear to the effect that the vessel and all of its machinery was in first-class condition at Hongkong and when leaving that port with the appellants' goods on board, and there was other testimony to the same effect. The valves in starboard tanks 1 and 2, in which was the merchandise of the appellants, were open and had been open since the vessel's departure from Iloilo, for the purpose of ventilation by means of the fan. The record shows that at Hongkong the cofferdam was filled with ballast water, and that the ship there also took on a certain quantity of coal—not sufficient to complete its voyage to San Francisco, but quite sufficient for its voyage to the intermediate port of Moji, Japan, where it contemplated and did take on a full supply of coal, pursuant not only to the custom of the ship, but also in accordance with the express understanding of the parties as evidenced by the following provision of the bills of lading covering the appellants' shipment, viz.:

"That the said vessel shall have liberty to take in coal or other necessary supplies at any intermediate port," etc.

The ship left Hongkong May 12, 1907, on her voyage to San Francisco by way of Moji, at which latter place it arrived May 18th, and there immediately commenced coaling, the coal being stored in her regular bunkers and in tanks Nos. 7 and 8. Shortly after commencing coaling at Moji, and on the same day, for the purpose of trimming the ship, her captain gave orders for the emptying of the ballast water from the cofferdam. As that had to be done by means of the pumps through the main line pipe, it was, of course, necessary to close the valves of the various tanks in order to prevent the flooding of them by the ballast water. Accordingly the first mate, in carrying out the captain's order, directed the third officer to close the valves, which he reported to have done, whereupon the pumping of the ballast water was commenced by direction of the first mate, shortly after which it was discovered by sounding that the ballast water was flooding the appellant's merchandise in starboard tanks 1 and 2 by reason of the fact that the valves in those tanks had not been closed as reported to the first officer. The pumping was thereupon immediately stopped and the carpenter summoned, who discovered that the valves in those tanks had been jammed or screwed too tight when opened, and evidently had not responded to the working of the ratchet on deck. The carpenter thereupon screwed the valves down, after which the pumping of the ballast water from the cofferdam was resumed, and the water also removed from tanks 1 and 2. The action is for damages thus done to the appellant's merchandise.

The contention that the ship was not seaworthy when she left Hong-

kong is based solely upon the fact that the valves in starboard tanks 1 and 2 were jammed or screwed too tight when opened for ventilation. We think that circumstance is far too trivial upon which to sustain the contention. The evidence shows without conflict that the carpenter when summoned readily and quickly closed the valves, and that there was nothing substantially the matter with them. This is quite clearly shown by the following excerpt from the direct and cross examination of the chief engineer; and there is nothing to the contrary:

"Mr. Page: Q. What happened after you started in to pump out the cofferdam? A. I was called there, and informed there was water in the tanks, and that they could not open the valves of the two tanks that the water was in.

"Q. Did you find out what was the matter? A. Yes, sir; they were jammed hard up.

"Q. What valves were those, what tanks? A. No. 1 and No. 2 tanks.

"Q. Was anything done? A. I found out what was the matter, and they were made workable, shut down, and I believe they pumped the water out. * * * "

Cross-examination:

"Mr. Denman: Q. You say that your attention was called to the fact that there was water in 1 and 2 holds, and that you examined the valves and found them hard open? A. Yes, sir.

* * * * * * * * * * * *

"Q. As a matter of fact, all you had to do was to screw down those 1 and 2 valves, and then go right to work continuing your pumping on the cofferdam? A. They pumped 1 and 2 out first.

"Q. How long did it take to do that? A. I have no recollection how long; not long, I should think.

"Q. A couple of hours? A. No, sir; half an hour.

"Q. What did you do more, screw down those valves? A. Screwed down those valves and pumped out the cofferdam."

"The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport," said the Supreme Court in the case of The Silvia, 171 U. S. 462, 464, 19 Sup. Ct. 7, 8 (43 L. Ed. 241). The open condition of the valves in the tanks in which was stored the merchandise of the appellants did not of itself cause the damage to the appellant's goods; on the contrary, those valves were opened and kept open for the very purpose of affording the merchandise proper ventilation, so that there was nothing in their condition at all affecting the fitness of the ship to carry the goods which she undertook to transport. When the trim of the ship or any condition of the sea or weather required the use of the pipes with which the valves were connected for water, thus necessitating the closing of the valves in order to prevent damage to the cargo, it was manifestly the duty of the officers of the ship to close the valves, just as it was the duty of the officers of the ship to put the iron shutters over the glass covers of the portholes in the case of The Silvia, supra.

In the case of The Mexican Prince (D. C.) 82 Fed. 484, 488, Judge Brown, in answering a contention that an obstruction of a similar valve rendered the ship there under consideration unfit, said:

"But, even if the alleged obstruction of No. 3 valve existed on leaving Rio, that would not constitute unseaworthiness; for, however it arose, the ob-

struction, if any, was accidental, of the most temporary character, and sure to be removed by suction upon the first test made with the pumps, and as well as by the exercise of reasonable diligence on any special occasion calling for care during the voyage. It would have been thus removed or else discovered in time to avert damage had the pump test been applied, as required by the owners' rules, either on the day of sailing or on the next morning, before the valves of No. 2 were opened. Reasonable prudence certainly required an actual test of the valves before opening No. 2 valves, considering the great mass of water that was to be sent through the pipes; and the master's order 'to make sure that the valves were shut' perhaps imported this. If the pump test was not applied, the full 16 turns up and down should have been given as the only other means of detecting an obstruction. Either of these means was sufficient. Both were neglected; and, after the water was started, no sounding of the other tanks by the pumps was made, as might easily have been done. The cause of the damage, therefore, was negligence in the use of the means of safety provided by the owners and a neglect to observe their written orders in that regard, and not any omission by the owners to provide for all the requirements of a seaworthy ship, and to put her in seaworthy condition. In other words, the fault arose wholly in the 'management of the ship' at a port of call and subsequent thereto. It arose during the voyage, and not from anything the owners did or omitted to do, or any lack of diligence by them, to make the ship seaworthy at the commencement of the voyage."

The closing of the valves involved in the present case should, of course, have been done before undertaking to pump the ballast water out of the cofferdam, and could readily have been done, as shown by the evidence, but for the negligence of the ship's officers.

The evidence shows that it took about 3½ days to coal the ship at Moji. The captain and first mate at first testified that the pumping of the ballast water out of the cofferdam was commenced, and the consequent damage to the appellant's goods done, just about the time the ship finished coaling and was preparing to sail for San Francisco, whereas it later appeared that as a matter of fact such pumping was commenced and damage done during the first half of the first day of coaling. And it is insisted by the proctors for the appellant that such testimony of the captain and first mate was willfully false, and that, as a consequence, their entire testimony should be disregarded. Let that be done, and the remainder of the record presents the real question in the case, which is, we repeat, whether the damage done to the merchandise of the appellants is properly referable to a lack of care in its proper protection and custody by the officers of the ship, or to their fault or error in the management of the vessel. In other words, whether the damage in question falls within the first or the third section of Act Cong. Feb. 13, 1893, commonly known as the Harter Act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]); those sections reading as follows:

"Section 1. That it shall not be lawful for the manager, agent, master, or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect."

"Sec. 3. That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agent, or master be held. liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

The proctors of the respective parties are agreed that the Supreme Court has held that the question which of these two sections is to govern must be determined by the primary nature and objects of the acts which caused the loss.

First, then, what was the act which caused the damage in the present case? Obviously the pumping of the ballast water out of the ballast tank into the main pipe. By reason of the neglect of the officers of the ship, before doing so, to close the valves of the tanks in which the appellants' merchandise was stored, the water entered the tanks and did the damage. Plainly the act done, to wit, the pumping of ballast water, is ordinarily, if not always, directly connected with the management of the ship. In this particular instance the direct object, according to the evidence, of pumping the water overboard, was properly to store the coal and trim the ship for the completion of her voyage to San Francisco. The words "navigation" and "management," within the meaning of the Harter Act, said the Supreme Court in The Silvia, supra, "might not include stowage of cargo, not affecting the fitness of the ship to carry her cargo. But they do include, at the least, the control, during the voyage, of everything with which the vessel is equipped for the purpose of protecting her and her cargo against the inroad of the seas; and if there was any neglect in not closing the iron covers of the ports, it was a fault or error in the navigation or in the management of the ship. This view accords with the result of the English decisions upon the meaning of these words."

In The Glenochil (1896) Prob. 10, after the arrival of the vessel in port and while she was unloading, the engineer, in order to stiffen the ship, let water into the ballast tank, and did it so negligently that the water got to and injured the cargo. The damage was held to result from fault in the management of the vessel within section 3 of the Harter Act, and the shipowner was held exempt. That decision was expressly approved by the Supreme Court in The Germanic, 196 U. S. 589, 597, 25 Sup. Ct. 317, 49 L. Ed. 610, the court at the same time pointing out the limitation of the section adopted by the court in The Glenochil, and sanctioned by the Supreme Court in Knott v. Botany Mills, 179 U. S. 69, 74, 21 Sup. Ct. 30, 32 (45 L. Ed. 90), to faults "primarily connected with the navigation or the management of the vessel and not with the cargo."

In The Germanic the Supreme Court proceeded to declare the law to be:

"If the primary purpose is to affect the ballast of the ship, the change is management of the vessel, but if, as in view of the findings we must take to have been the case here, the primary purpose is to get the cargo ashore, the fact that it also affects the trim of the vessel does not make it the less a fault of the class which the first section removes from the operation of the third. We think it plain that a case may occur which, in different aspects, falls within both sections, and; if this be true, the question which section is to govern must be determined by the primary nature and object of the acts which cause the loss."

It is obvious from the record in the case in hand that the purpose in pumping the ballast water overboard had nothing whatever to do with getting the appellants' merchandise or any other part of the cargo ashore, but, on the contrary, was for the purpose of taking on coal and properly trimming the ship to carry the whole cargo to San Francisco, and hence we conclude that the act which caused the damage in question related directly to the management of the ship, and that the failure of her officers to take the precaution to see that the valves in the tanks in which the appellants' merchandise was stored were closed before commencing the pumping of the ballast water, while gross negligence, was negligence for which the shipowner was not responsible by reason of the third section of the Harter Act.

The judgment is affirmed.