## THE SKIPTON CASTLE.

(Circuit Court of Appeals, Ninth Circuit. May 7, 1917.)

### No. 2774.

1. SHIPPING ⬥141(1)—LIABILITY FOR DAMAGE TO CARGO—HARTER ACT—CONSTRUCTION.

 The "negligence, fault or failure in proper loading, stowage, custody, care or proper delivery" of cargo, from liability for which, under Harter Act Feb. 13, 1893, c. 105, § 1, 27 Stat. 445 (Comp. St. 1916, § 8029), a vessel cannot exempt herself by any clause or agreement in the bills of lading, applies to the care necessary to protect the cargo from injury during the voyage, where it does not primarily have to do with the navigation or management of the vessel.

2. SHIPPING ⬥141(1)—LIABILITY FOR DAMAGE TO CARGO—HARTER ACT.

 On a voyage from Antwerp to California ports, requiring some two months, a portion of the cargo stowed in between-decks compartment, consisting of bottled mineral water and willow baskets, was badly damaged by the heating of a shipment of bone meal stowed in the hold directly below; the hatchway between the two holds having been left partly uncovered to permit the circulation of air. The excessive temperature of the lower hold, showing that the bone meal was heating, became evident on the fourth day out, and greatly increased afterward; but nothing was done to protect the cargo above, although it could readily have been removed sufficiently to permit the closing of the hatchway, and the holds had separate ventilators. *Held* that, under section 1 of the Harter Act, the ship was liable for the damages, notwithstanding a provision of the bills of lading exempting it from liability for loss or damage caused by sweating, leakage, breakage, or decay.

Appeal from the District Court of the United States for the First Division of the Northern District of California; Maurice T. Dooling, Judge.

Suit in admiralty by the American Import Company, a corporation, Tillman & Bendel, a corporation, James L. De Fremery and Henri M. Suermondt, partners as Jas. De Fremery & Co., and the Appolinaris Company, Limited, against the British steamer Skipton Castle; the Lancashire Shipping Company, Limited, claimant. Decree for libelants, and claimant appeals. Affirmed.

For opinion below, see 223 Fed. 839.

Edward J. McCutchen, Ira A. Campbell, and McCutchen, Olney & Willard, all of San Francisco, Cal., for appellant.

William Denman and Denman & Arnold, all of San Francisco, Cal., for appellees.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

HUNT, Circuit Judge. Action for damages to cargo. The British steamer Skipton Castle, bound to San Pedro and San Francisco, loaded at Antwerp in December, 1910, with a quantity of bottled mineral water, willow baskets, and general cargo. When the ship arrived at the ports of discharge in February, 1911, a great many of the bottles were found in broken condition and the baskets had rotted. Shipment was under bills of lading stipulating that the ship should not be liable for loss or damage occasioned, among other things, by "sweating, leakage, breakage, wastage, decay, or the indirect causes thereof, * * * the negligence, default, or error in judgment of the master, mariners, * * * or other persons employed on or about the ship." The libel charged that the damages were inflicted while the cargo was in the possession of the ship, by water and breakage and leakage of the bottles because of bad stowage and unseaworthiness. The answer admitted that there had been some damage, but alleged that whatever damage was done was within the exceptions of the before-mentioned bills of lading, exempting a ship from liability for loss or damage by breakage, wastage, decay, sweating, and other like causes. The District Court held the claimant liable, because of the failure of those in charge of the ship to remove the cargo stowed on the 'tween-decks hatches, close the hatches, and care for any merchandise then found to be suffering injury because of heat or moisture, by drying and airing it. Claimant appeals.

A quantity of bone meal stored in compartment No. 1, lower hold, was loaded in the winter, December 8th, at Antwerp, when the temperature was about 40 degrees Fahrenheit. As far as external examination showed, the bone meal was in good condition when it was taken aboard the ship. The mineral water was stored in the forward part of the 'tween-decks No. 1 hold, and the willow ware and the general cargo in the hatchway and wings of the same compartment. The weight of testimony is to the effect that compartment No. 1 between-decks was believed to be the coolest, and therefore the best in which to store the mineral water. Compartment No. 1 between-decks and the lower hold were equipped with standard ventilators. The ventilator pipes from the No. 1 hold passed through from the forward " 'tween-decks compartment" and out upon the open deck, where they terminated in the four ventilator hoods. The ventilator pipe out of the top of the between-decks fitted around the outside of the pipes from the hold, and through it a separate current of air passed in and out. One of the witnesses described the ventilating system as "telescoped," with the object of having ventilation go up, instead of mixing through the between-decks space.

Four days after the ship sailed, on December 12th, the temperature of the No. 1 hold was 18 degrees warmer than the next compartment, and 49 degrees warmer than the outside air. No. 2 hold showed 83 degrees. Conditions of high temperature in the hold below continued, due undoubtedly to heating of the bone meal. Again on December 22d the temperature in the forward hold at the foot of the ventilator showed 101 degrees, and on December 30th, when the ship was at Las Palmas, the temperature showed 110 degrees, while the hold No. 2 showed 85 degrees. The evidence is that a temperature of 90

degrees would be cause for worry, while 110 degrees would cause great anxiety. When these conditions of temperature were indicated, some hatch boards were taken off the forward end of the deck hatch above and two of the boards aft. This, however, was not effective, for after the removal of the two planks the temperature in the lower hold was 100 degrees, and remained at 100 or above for the ensuing 10 days. No attempt was made to shift the cargo, so as to let air down into the hold. The ventilators and hatches were kept as they usually had been. The weather was good on December 22d and for the four days thereafter. No sufficient reason is given for failure during that time to take the upper hatch off and to take the cargo on the lower hatch up to the deck, in order that the lower hatch flooring could be laid in its place, or canvas laid over the opening, in order that the heat in the lower hold could be forced out through the ventilators which ran from that hold. The hot air could have been let out by opening the entire face of the upper hatch when the heating was first discovered, or by taking out the cargo and letting it pass out through the ventilators, making tight the lower hatch floor. It is possible that some damage was caused by heating prior to the time when it was plain that the fertilizer was heated; but, if proper attention had been given when the heat indicated rotting, it is fair to believe the damage would have been of no consequence. It is clear, therefore, that testimony concerning the condition of the hatches became most material, and after careful reading of the whole evidence the most reasonable conclusion is that the proximate cause of the damage was the failure to let out all the hot air possible from the lower hold.

[1] We need not consider the question whether the vessel was sent to sea in a seaworthy condition, for we can assume that she was. But upon that assumption there remains the question whether there was negligence on the part of the ship in the care of the cargo during the voyage. In Knott v. Botany Worsted Mills, 179 U. S. 69, 21 Sup. Ct. 30, 45 L. Ed. 90, the Supreme Court ruled that it was not a sufficient compliance with the provisions of section 1 of the Harter Act merely to give proper care, custody, and caution to the loading and stowage of cargo before sailing, but that duty continues throughout the voyage. This rule was laid down in a case where wool was properly stowed in a seaworthy compartment when the vessel started on her voyage, but the wool was damaged on the voyage because of drainage from wet sugar stowed near the wool. The drainage was caused by alteration of the trim of the ship. The court held that the violation of one of the obligations toward the cargo enumerated in section 1 of the Act of Congress (27 Stat. 445), namely, that there must be good stowage of cargo subsequently located, although occurring after the voyage of the injured cargo had started, made the ship liable. The court said:

"Since this damage arose through negligence in the particular mode of stowing and changing the loading of cargo, as the primary cause, though that cause became operative through its effect on the trim of the ship, this negligence in loading falls within the first section. The ship and [her] owner must therefore answer for this damage, and the third section is inapplicable."

In the later case of The Germanic, 196 U. S. 589, 25 Sup. Ct. 317, 49 L. Ed. 610, the court approved of the rule of Knott v. Botany

Worsted Mills, supra, and held that, where the primary purpose is to affect the ballast of the ship, the change is management of the vessel, but, where the primary purpose is to get the cargo ashore, the fact that it also affects the trim of the ship does not make it the less a fault of the class which the first section of the Harter Act removes from the operation of the third section of the act. The court recognized that a case might occur, which in its different aspects would fall within both sections, and said that the question which section is to govern must be determined by the primary nature and object of the acts which cause the loss. Both of these decisions of the Supreme Court were cited by this court in Corsar v. Spreckles Bros. & Co., 141 Fed. 260, 72 C. C. A. 378, where the court considered the question involved under the facts as primarily and essentially one of navigation, and therefore the determination of the master would not make the ship or her owner liable for any incidental damage sustained by the cargo, because of the third section of the Harter Act. In Nam v. The Appalachee, 202 Fed. 826, 121 C. C. A. 130, this court regarded the question there involved as whether the damage done to the merchandise was properly referable to a lack of care on the part of the officers of the ship, or to fault or error on the part of the officers in the management of the ship, and quoted from the Germanic Case, supra. The distinction in the rule applicable was observed by the Court of Appeals of the Second Circuit in The Persiana, 185 Fed. 396, 107 C. C. A. 416, where oil was allowed to accumulate in the bilges, not for the ship's purposes, but because the master intentionally allowed it to accumulate to save it for profit. United States v. New York & O. S. S. Co., Ltd., 216 Fed. 61, 132 C. C. A. 305, also decided by the Court of Appeals of the Second Circuit, seems to have turned upon the particular facts, although some of the comments of the court seem at variance with the rule of the earlier decision in the Persiana Case, supra, not referred to by the court.

[2] In the case at bar the navigation of the ship was not affected by the failure to raise the cargo stowed on the hatch, and to put it on the deck and dry it there, closing the hatch and then replacing the cargo; and while doubtless the removal of the upper hatch boards to get the cargo out, and the putting of canvas or additional hatch boards under the cargo in the lower hatch pertained to the management of the ship in an incidental sense, yet the primary purpose would be care of cargo threatened with injury from heat below.

We are of opinion, therefore, that the appellees proved their case by the greater weight of evidence, and that the decree should be affirmed. So ordered.