## THE KOAN MARU.

(District Court, S. D. New York.   December 31, 1917.)

1. SHIPPING ☞123—IMPROPER STOWAGE.
     The stowing of shellac, which is easily stained, in a compartment which had recently contained coal, and from which the coal dust had been removed by sweeping only, without washing, was negligent stowage.

2. SHIPPING ☞138—FAULT IN MANAGEMENT.
     Negligence in stowing of shellac in a compartment which had recently contained coal, and from which the coal dust had been removed by sweeping only, without washing, was not relieved because of fault in management.

3. SHIPPING ☞123—IMPROPER STOWAGE.
     The stowing of shellac, which is easily stained, in between-decks compartment above coal bunkers, arranging the bags of shellac to form a hole through which the vessel was later coaled, the coal being separated from the bags by a temporary coal chute, consisting of planking and dunnage mats, not dust tight, and without canvas, was negligent stowage.

4. SHIPPING ☞138—FAULT IN MANAGEMENT.
     Negligence in stowing shellac in a between-decks compartment above coal bunkers, arranging the bags of shellac so that the vessel was coaled through a hole in them protected only by planking and dunnage mats, was not relieved because of fault in management.

5. SHIPPING ☞140—LIMITATION OF LIABILITY.
     A bill of lading clause, limiting liability to invoice cost, not exceeding £50 per freight ton or £20 per package, was valid.

6. SHIPPING ☞140—LIMITATION OF LIABILITY.
     A bill of lading clause providing that, in the event of liability against vessel or owners, no value should be placed on the merchandise higher than the invoice cost, not exceeding £50 per freight ton, and relatively for any portion thereof, or exceeding £20 per package, limits liability to £50 per ton in any case, and also to £20 per package, and shipper did not have option to choose whether its goods came under one or the other of these figures.

In Admiralty.   Libel by Mark & Rawolle, Incorporated, against the steamship Koan Maru.   Decree for libelant as indicated.

Black, Varian & Simon, of New York City (Herbert M. Simon and Warren Bigelow, both of New York City, of counsel), for libelant.

Burlingham, Montgomery & Beecher, of New York City (Roscoe H. Hupper, of New York City, of counsel), for claimant.

MAYER, District Judge.   Libelant was the owner of 2,720 packages or bags of shellac delivered to the Koan Maru at Calcutta in December, 1916.   When the vessel discharged her cargo at New York on March 12, 1917, it was found that 737 bags and their contents had been blackened and damaged.   This condition libelant attributes to negligent stowage, which, if shown, would concededly make the ship liable.   Claimant contends:   (1) That there was no negligence; (2) that, if there was, it was a fault in management; and (3) in any event liability is limited by the limited liability clause of the bills of lading.

[1-4]   The bills of lading provided inter alia:

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

(a) "But nothing herein contained shall exempt the shipowner from liability to pay for damages to cargo occasioned by bad stowage;" but (b) "the steamer is not liable for ❋ ❋ ❋ loss or damage by dust from coaling on the voyage."

The 737 bags were stowed in No. 2 hold 'tween-decks, just above the bunkers, which contained coal. The rest of the shellac was stowed elsewhere in the ship and arrived undamaged. The vessel had gone from Japan to Singapore with a cargo of coal in this same compartment 'tween-decks. This coal was unloaded at Singapore, and the vessel then proceeded without cargo to Calcutta, where she took on the shellac.

The cleaning of the compartent was done on the voyage from Singapore to Calcutta under the supervision of the boatswain, and when completed was inspected by Yamashaita, chief officer, whose deposition was taken out of court with the aid of an interpreter. If properly cleaned, it would seem that this stowage would have been prudent. The testimony shows, however, that the cleaning was perfunctory; i. e., merely sweeping, at best, broom clean. Yamashaita's testimony is:

"Q. I understood you to say that before the ship began loading at Calcutta, you inspected this No. 2 'tween-decks and saw that it was clean; is that correct? A. Yes. Q. Was there any coal left there then? A. No; all cleaned up. Q. What do you mean by cleaned—swept and washed? A. Swept."

Shellac is easily stained, and thus a perishable commodity. I should think, without expert testimony, that mere sweeping would not remove the danger of staining a cargo such as this, or, in any event, would be likely to expose it to that danger. However, Capt. Bagger, a well-known expert, whose qualifications were referred to in Kirsch v. San Guglielmo (D. C.) 241 Fed. 969, pointed out that proper cleaning would have required those in charge to "either wash the hold out, or sweep the hold out with wet sawdust, or with lime or some other substance that will remove the coal dust"—none of which was done.

The vessel, after leaving Calcutta, took on coal at Durban. In addition, it further appears that the damaged shellac was improperly stowed, in that the bags were themselves so arranged as to constitute a coal chute through which the ship was coaled at Durban. Yamashaita testified that in the deck or flooring of this compartment there was a hatch leading to the coal bunkers below, and a corresponding hatch in the roofing or main deck; that when the 737 bags were stowed at Calcutta they entirely covered the lower hatch; that, when the shellac settled, the bags on top of the closed hatch were pushed to one side and a temporary coal chute erected right through the compartment full of shellac, from the deck above to the coal bunkers below; and that coal was loaded through this opening and remained in the chute itself until consumption of the coal below caused the level to fall. This condition existed from one day out of Calcutta until the vessel's arrival at New York. The situation was summarized in the following question to and answer by Capt. Bagger:

"Q. I want you to further assume that this compartment in which the shellac was stowed was for the coal bunkers of the vessel, the cross-bunker, and

251 F.—25

that in the flooring of that compartment is a cross-bunker hatch, and that it was apparent to the captain of the vessel, and known to him, that on the voyage he would have to stop for the purpose of coaling. The only means of access to this coal bunker underneath is assumed to be the hatch in question, and the only means that was taken for the protection of the shellac in the compartment through which the coal was inserted is the erection of a bulkhead composed only of planking and of dunnage mat, and without any canvas in the construction. I ask you, under those circumstances, whether it was or was not proper to stow shellac in the compartment with this bulkhead, instead of less perishable goods, merchandise? A. It is not good stowage to stow shellac in a place where coal had passed through a chute, as it would be only of single planks, without canvas, or something to make it tight. Mats would be no use for that purpose."

Capt. Bagger also made clear that dunnage mats which are composed of vegetable fiber are not dust tight. For either of the causes above described, the ship is liable as for bad stowage, and not relieved because of fault in management.

Yamashaita endeavored to account for the damage because the coal taken on at Durban was "so fine that the coal itself went through even into the chief officer's cabin" at the stern of the vessel; but that explanation seems unsatisfactory, when it is remembered that all the shellac cargo elsewhere stowed was not damaged. If true, however, the chute arrangement above described was clearly bad stowage. Knott v. Botany Mills, 179 U. S. 69, 21 Sup. Ct. 30, 45 L. Ed. 90; Lancashire Shipping Co. v. American Import Co., 243 Fed. 523, 156 C. C. A. 221; The Jeannie, 236 Fed. 463, 149 C. C. A. 515. The proposition in The Indrani, 177 Fed. 914, 101 C. C. A. 194 (cited by claimant), where the vessel was tipped by the head while discharging cargo, is quite different.

[5, 6] The final question is as to the amount of liability. The bill of lading clause is as follows:.

"It is mutually agreed that unless a higher value be stated herein, and an increased freight rate specially arranged therefor, the value of the merchandise hereby receipted for does not exceed £50 per freight ton, or relatively for any portion thereof or exceed £20 per package, and that the freight has been adjusted on such valuation, and no oral declaration or agreement shall be evidence of a different provision, or of a waiver of this clause in the event of any liability being adjudged against the steamer, or owners in respect of the merchandise no value shall be placed on such merchandise higher than the invoice cost not exceeding £50 per freight ton, and relatively for any portion thereof or exceeding £20 per package, or such other value as may be expressly stated herein, nor shall the shipowner be held liable for any profits or consequential or special damages, and the shipowner shall have the option of replacing any lost or damaged goods."

Such a clause is good, under repeated authority, of which Hart v. Penn. R. R. Co., 112 U. S. 331, 5 Sup. Ct. 151, 28 L. Ed. 717, and Wells Fargo v. Neiman-Marcus Co., 227 U. S. 469, 33 Sup. Ct. 267, 57 L. Ed. 600, are examples. This clause means that the liability shall not exceed £50 per ton in any case, and also shall not exceed £20 per package.

If libelant's construction to the contrary were adopted—i. e., that it had the option to choose whether its goods came under one or the other of these figures—the clause would be inconsistent and meaningless.

It is elementary that, whenever possible, contracts must be construed so as to make sense and give them a consistent meaning. In the left-hand margin of the bill of lading it is noted that the freight was paid on a tonnage basis, and, by virtue of the provisions of the bill of lading, it must be presumed that the freight rate was based on a valuation of £50 per ton, and this must be the basis and limit of liability in this case.

Libelant may therefore have a decree as indicated, and with costs.