## THE HYADES.

### (District Court, S. D. New York. October 16, 1902.)

1. SHIPPING—DAMAGE TO CARGO OF WHEAT—SEAWORTHINESS WITH RESPECT TO HATCH COVERINGS.

A steamer cannot be held liable for damage to a cargo of wheat from water, under the Harter act, on the ground of failure to use due diligence to make her seaworthy at the commencement of the voyage, by reason of the insufficiency of her hatch coverings, where the evidence showed that she was nearly new, that the wooden covers fitted closely, and were covered with two cotton duck covers, nearly new, and of better than the usual quality, properly secured, making a covering that is usually considered sufficient, and which was specifically approved by the underwriters' surveyors, under whose direction the loading was done as provided by the charter; it being further shown that, two days after she left Galveston with her cargo, she was caught in the storm which wrecked that city, and for nearly three days was unable to make headway, during which time the seas breaking over her tore some of the hatch covers loose, and she suffered injuries, by straining and otherwise, which it cost $14,000 to repair. Under such evidence the damage must be attributed to perils of the sea.

2. SAME—SEA PERILS—EVIDENCE.

The fact that one vessel passed through a storm without injury to her cargo is not evidence of much weight on the question whether another, sailing two days after her, was subjected by such storm to unusual sea perils.

In Admiralty. Action to recover for damage to cargo.

Wing, Putnam & Burlingham, for libelants.

Butler, Notman, Joline & Mynderse, for claimant.

ADAMS, District Judge. This is an action brought to recover damages alleged to amount to $20,000 and upwards, by reason of a failure on the part of the vessel to deliver at New York some 29,000 bushels of wheat in the like good order and condition in which it was shipped at Galveston, Texas, on or about the 5th day of September, 1900. Other wheat was damaged on the voyage, concededly from sea perils, but the present controversy is limited to the damage which the cargo received under the hatches, which it is alleged in the libel resulted from the unfit and unseaworthy condition of the vessel, in that her hatches were not caulked, nor properly covered with tarpaulins as customary, only two canvas coverings (without tar or water proofing) having been put over the hatch sections, so that all the hatches leaked, as the seas swept over the ship.

The answer admits damage to the cargo, but avers that in and by the terms of the bills of lading, under which the cargo was shipped,

¶ 1. Loss by perils of the sea, see note to The Dunbritton, 19 C. C. A. 465.

and in and by the terms of the charter party referred to in the bills of lading, it was provided that the vessel should not be liable for loss or damage occasioned by causes beyond her control, by the perils of the seas or other waters, or by other accidents of navigation, or by unseaworthiness of the vessel even existing at time of shipment or sailing on the voyage, provided the owners of the steamer have exercised due diligence to make her seaworthy; and that the contract shipment should moreover be subject to all the terms and provisions of and all exemptions from liability contained in the Harter Act. It is further averred that by the terms of the charter party it was provided that the steamer should load under the inspection of the underwriters' agents and should comply with their rules. It is further averred, in substance, that the steamer was almost new and in all respects seaworthy for the carriage of the cargo in question; that she fully complied with the requirements of the contract in every respect, and that during the voyage she met with exceedingly violent weather, which is described in detail, causing perils of the seas, to which the damage of the cargo was entirely due.

The contract of shipment sustains the claims of the answer and the controversy in the case turns upon the question whether the damage was due to insecure hatches, as the direct and proximate cause, rather than to sea perils.

It would not be profitable to discuss the evidence at length. It is shown that the hatches were covered by two cotton duck covers, one of which was new and the other nearly so, both being in good condition. This number of covers is usually deemed sufficient to afford perfect security and was specifically approved in this case by the underwriters' surveyors at Galveston, who by the charter party were to supervise the loading of the vessel. Other reliable testimony appears to the effect that though three covers are sometimes used, they have not been deemed necessary in this trade, and that the third cover is ordinarily an old one, called a "chafer" and used for the purpose of protecting the others from wear, not with a view of affording additional security save as it may so serve. The covers in this case were made of duck, known as "hard No. 1." The evidence shows that it was more than ordinarily heavy and of the best quality and that such canvas has for many years been regarded by competent persons as a suitable material for hatch covers. The evidence also satisfies me that under ordinary circumstances two thicknesses of such canvas were ample to afford all reasonable security to the hatches. The covers are also criticised because they were not tarred or otherwise treated to render them absolutely impervious to water, but it is also clearly shown that it is not usual to tar or otherwise treat duck of this grade and weight because it is closely woven and is ordinarily impervious to water without treatment and there is testimony to the effect that the canvas is in fact injured by such treatment. I do not see how a charge of unseaworthiness can be sustained with respect to these covers under the circumstances of this case, even without regard to certain damage which they sustained from perils of the seas, because the evidence establishes that their use fulfilled all the requirements of due diligence under the Harter Act. Another criticism made upon the vessel's

hatches is that they were not made water tight by caulking or chinsing and testimony has been given on the part of the libellants that it is customary to close the seams in such manner, but on the other hand it appears that this vessel, of the most modern construction, had unusually high hatch coamings, which prevented the hatches from continuing submerged when water was held on deck, the bulwarks being the same height as the coamings. Moreover the hatch fittings were designed to afford security without resorting to devices necessary in vessels of other types. Wooden hatch covers about six or seven feet in length, four feet in width and three inches in thickness, were laid in tiers fore and aft in the coamings. These covers had straight and square edges, designed to fit closely without caulking and in fact they fitted so closely, that when they were put on in Galveston, it was necessary to use force to get them into place. They differed from covers designed for caulking in that the latter have a bevelled edge, in order that there may be room for the oakum used in caulking. These covers were securely bolted to fixtures in the coamings, which kept them steady, and over them the duck covers mentioned were carefully spread, the edges being dropped into iron lugs set on the coamings about two feet from the deck. Steel battens were then dropped into the lugs and wedged into position with oak wedges. Altogether, a method of protection to the hatches was formed which met the unqualified approval of the underwriters' surveyor at Galveston before the vessel sailed. Testimony has been given on the part of the libellants tending to show that the duck was not absolutely water tight after the vessel arrived in New York and that when here the hatch covers did not fit as closely as it appears they did when she left Galveston, but what happened after the event is not sufficient to establish lack of due diligence before the voyage commenced, especially in view of what the vessel had gone through with in the meantime, to which I will now advert.

The steamer left Galveston, Wednesday morning September 5th. The weather was then fair, though a local storm, called a "Norther," was expected about the time. The indications were that a storm was impending but there was none that unusual precautions would be required by a vessel of this character. It continued fair through that day and through the following day, though the barometer commenced falling rapidly at about 9 o'clock Thursday night. At midnight Thursday there was a gale. By 5 o'clock Friday morning a hurricane prevailed and the steamer could no longer make her course. This was the storm which devastated Galveston and its severity is so well known that the particulars of the ruin it wrought need not be referred to. From about 5 a. m. of Friday morning until 1 p. m. Sunday the steamer lay hove to, when for a few hours, during a lull, she was enabled to proceed but was then forced to lie to again. Excepting for the few hours mentioned, her engines during this time were reduced from a normal number of full speed revolutions of about 85, giving a speed of 9 knots, to from 60 to 65, which in ordinary weather would have given a speed of 6 or 7 knots, but which under the prevailing conditions were only sufficient to keep the steamer's head to the wind and instead of being able thereby to make any easterly headway towards

her destination, she was actually blown to the southward and west-ward. The result of her encounter with this terrific storm was that her steam and hand steering gear broke down, everything movable on deck was washed away, the ventilators fifteen feet above the deck, were carried away, rails were broken, a life boat and water tank were torn from their fastenings and carried overboard and other damages done, causing a general leakage and damage to cargo. It was afterwards found, when the vessel was dry-docked for repairs in New York, that, as a result of the storm, the vessel, though new and unusually strong, was so strained and damaged in her hull, that it cost some $14,000 to make necessary repairs. During the stress of the storm, some of the wedges holding the steel battens in the lugs of the coamings became loose, the battens were bent by the force of the waves on deck and the canvas covers in some of the hatches were partly washed from their fastenings and torn. Efforts were made by those on board during the height of the storm to secure the loosened covers by means of spiking battens on top of the hatches, which was accomplished by the officers and men with the use of life.lines, but they were only partially successful in keeping out the water.

It is sought to overcome the natural and probable effect of the storm by showing that the steamer Michigan left Galveston at about the same time as the Hyades, encountered the same storm and delivered her cargo of wheat in good order and it is urged that the result followed the use of three tarpaulins, instead of the two canvas covers used on the Hyades. One difficulty with the contention is that the Michigan did not by any means encounter the same perils that the Hyades was subjected to. She left Galveston September 3d, two days in advance of the Hyades and though she was doubtless in the outer extremity of the cyclonic hurricane and suffered therefrom in the shifting of her cargo and a consequent list, it is not shown that she was exposed to such extremely severe weather as the Hyades met with in passing through the center of the storm. Moreover, if the vessels had been side by side throughout the storm, the escape of one from damage would not afford evidence of much persuasiveness in determining whether the other was subjected to sea perils. The power and destruction of waves which cause wreckage on one vessel, can not be measured by the absence of injury from other waves to another vessel. Even in the absence of any injury to the other one, the question would still remain whether the injured vessel was subjected to extraordinary marine perils.

This seems to be a case where the damage should properly be attributed to sea perils rather than to any lack of due diligence in equipping the vessel and making her seaworthy.

Libel dismissed.