AMERICAN SUGAR REFINING CO. v. RICKINSON SONS & CO.

(Circuit Court of Appeals, Second Circuit. July 1, 1903.)

No. 181.

1. SHIPPING—DAMAGE TO SUGAR CARGO—FAULT IN MANAGEMENT OF SHIP.

Sugar cargo stored in a hold was damaged during the voyage by seawater, which entered from a water ballast tank through a manhole. The ship's carpenter, who made the manhole joint some three weeks before the vessel was loaded, testified without contradiction that he made a good tight joint, and that it was tested several times before sailing by the filling of the tank, and did not leak. The top of the tank was some 17 feet below the water line, and it was shown that shortly after sailing the sea cock was opened for the purpose of filling the tank, and negligently left open for 7½ hours, although 2 hours was sufficient to fill the tank, by reason of which the tank was subjected to great pressure. As to whether or not such pressure was sufficient to cause the packing to blow out of the manhole joint if properly constructed there was a conflict of testimony. Held, that it was not incumbent on the owners to test such joint by a pressure greater than it would be subjected to under conditions of good navigation, and that the evidence was not sufficient to show that the ship was unseaworthy at the beginning of the voyage, but rather showed that the leakage was caused by leaving the sea valve open, which was a fault in the management of the ship, for the consequence of which the owners were exempted from liability by section 3 of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]).

Appeal from the District Court of the United States for the Southern District of New York.

In Admiralty. Libel in personam.

For opinion below, see 120 Fed. 591.

Appeal from a decree of the District Court for the Southern District of New York, entered February 20, 1903, for $3,713.55, in favor of the libelant for damages to cargo of sugar laden on the respondent's steamer Albion, in August, 1900. The libelant alleges that the damage was occasioned by the failure of the respondent to use due diligence to make the vessel seaworthy before sailing. The essential facts are fully stated in the opinion of the court below.

The testimony of respondent was taken at Newcastle-on-Tyne, the parties being represented by members of the English bar who seem to have been unfamiliar with the provisions of the Harter act. The consequence is that the record is vague and indeterminate. Much testimony which seemingly could have been adduced has been omitted, and other testimony has been returned which has little relevancy to the points in controversy.

The damage was occasioned by seawater admitted through the manhole door of ballast tank No. 4, which was directly under hold No. 3, where the sugar was stowed. The ship's carpenter, who made the manhole joint, which gave way and caused the damage, testified that he made a good, tight joint at Java three weeks before loading and sailing and within that time it was tested on several occasions by filling the tank. He says: "The condition of the manhole door before the cargo was loaded at Java was good and the joints were perfectly tight. I made it myself. * * * It was after we reached Soerabaya that I made this manhole joint. Whilst we were lying there the ship was being painted and the after ballast tanks run in and pumped out and the fore tanks similarly vice versa for tipping the ship to paint. During the whole of that time there was no leakage from that manhole door. * * * At the time when the cargo was loaded the vessel was a little by the head and had a list to port. I know that something was done to correct the trim by filling No. 3 and No. 4 tanks."

Tank No. 4 was filled with seawater after the voyage was begun. Through the negligence of the engineers the valve was left open from about 8 o'clock in the morning until about 3:30 in the afternoon. Two hours were sufficient to fill the tank. During several hours after the tank was filled the manhole joint was, therefore, subjected to the pressure of the sea. In speaking of this the carpenter says: "If the sea cocks were not closed when the tank was closed the result would be a great strain on the top of the tank, which would very likely cause the manhole packing to give out. By a great strain I mean hydraulic pressure from the sea bearing on the top of the tank."

In his opinion no other cause except this pressure can be assigned for the subsequent blowing out of the packing of the manhole joint.

The manhole door "is held in position by dogs on the top side of the tank and bolts through the dog and through the door and nuts on the upper end of the bolts, and where the flange or edge of the manhole door bears upon the tank top, it is packed by white lead and spun yarn." There is some testimony that this work belongs to the engineer's department, and should have been undertaken by one of the engineers, but it is by no means satisfactory, the custom differing on different ships. The making of the joint was not a matter of much difficulty and was entirely within the capacity of the carpenter or any mechanic of ordinary intelligence.

The chief engineer and third engineer of the Albion were also examined. They knew nothing regarding the joint made by the carpenter. They testified that after leaving Java the tank was run up and the sea cocks were open until 3:30 p. m.; that the manhole door must have had the full pressure of the sea for several hours, and that this pressure, "which must be enormous," would account for the leaking of even a good joint. The third engineer says: "I agree with the carpenter that it must have been a tremendous pressure of the sea outside that burst the packing. The joint must have given way by the great pressure." The chief engineer testifies that "the excessive pressure on the tank by leaving the sea cock open after the tank was full was bound to start the manhole. * * * I admit that the fault here was the sea cock not being closed, thus causing excessive pressure on the manhole of the tank. * * * I adopt the position that this water in the hold and damage to the cargo resulted from the want of attention of the officers of the ship." He also testifies: "At Java we ran up the tanks several times, but not knowing when the manhole door was made, it is difficult for me to say when it would burst. It is perfectly clear that it did not burst in Java but in leaving. It is perfectly clear that it did not burst when the ship took in cargo or we would have seen it."

The only oral evidence offered by libelant was the testimony of two experts who say, in substance, that if the manhole joint had been properly packed no amount of pressure by leaving the sea cock open could have blown out the joint. Conceding that it is improper to leave the pressure of the sea on the top of a tank for several hours after a ballast tank is filled, it is their opinion that this would produce no effect upon a manhole joint if it were perfect, and the fact that the packing blows out warrants the inference that the joint is unsound.

J. Parker Kirlin and James T. Kilbreth, for appellant.

Charles C. Burlingham, for appellee.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

COXE, Circuit Judge (after stating the facts as above). In the case of International Nav. Co. v. Farr & Bailey Co., 181 U. S. 218, 21 Sup. Ct. 591, 45 L. Ed. 830, the Supreme Court, at page 226, 181 U. S., page 594, 21 Sup. Ct., 45 L. Ed. 830, say:

"Even if the loss occur through fault or error in management, the exemption cannot be availed of unless the vessel was seaworthy when she sailed, or due diligence to make her so had been exercised."

The questions to be determined, therefore, are, first, was the ship seaworthy at the commencement of the voyage, and, second, if not seaworthy did her owners exercise due diligence to make her so?

It is unnecessary to discuss the negligence of the engineers in leaving the sea cock open, for the reason that this fault is undisputed in the testimony and is practically conceded by the libelant. In the brief it is stated:

"If it is admitted that it was a fault in management to allow the sea cock to remain open for five hours longer than usual, this error will not exonerate the shipowner, for he has failed to furnish a seaworthy ship."

That the careless filling of the tank was a fault in the management of the vessel is manifest. The Glenochil (1896) Prob. Div. 10, 8 Asp. N. S. 218. For such faults the owner, if he has exercised due diligence to make the vessel seaworthy, is not responsible, under the third section of the Harter act.

The witnesses for the respondent agree that the pressure produced by the open sea cock was sufficient to blow out the packing no matter how carefully made. The libelant's experts deny this, but admit that it would produce some additional pressure upon the top of the tank. One of them testified as follows:

"The pressure that could come from the sea would only be due to the ordinary floating of the ship, and that pressure is within the ordinary conditions for which a ship is constructed, and for which the tanks are constructed."

No tests were made and no data appears in the record from which the amount of pressure can be estimated. In such circumstances the court must proceed upon the proof as made by the parties. We are not permitted to enter the domain of science and attempt an application of the principles of hydrostatics to the facts in hand even if competent to do so. We may, however, consider some propositions which appear to be elementary.

The top of the tank was about 17 feet below the level of the sea, and it is evident that if the manhole door and the sea cock had both been left open the water in the water-tight hold would in time have risen to the level outside. With the manhole door closed the pressure produced by this tendency of water to rise to its own level was resisted by the top of the tank, the door being a part thereof. The degree of force thus exerted is not shown, but it must have been considerable and it was a force that the door was not intended to resist.

Assuming that the cock had been closed when the water had risen to a point an inch from the top of the tank, it is apparent that, when the ship was on an even keel, no strain whatever would have been brought upon the joint. The rolling and pitching of the ship would have produced pressure in all respects similar to that which the joint successfully withstood when the ship was being painted at Java.

The contention seems to be well founded that the pressure last described might cause an imperfect joint to leak so that the water would percolate through the packing, but that it would not cause the entire packing to "blow out" as was the case with the joint in question. Such a result, it is argued, could only result from a much greater pressure than is produced by the normal conditions of navigation.

One of the libelant's experts says:

"If the joint is effectively and properly made I do not think that any pressure coming on it would start the joint on a construction such as indicated by the description. The greater the pressure the tighter the joint will be."

It would seem that this opinion leaves out of view the fact that the pressure upon the joint was equal in all directions. The lateral pressure upon the packing was as great as the vertical pressure upon the steel door itself. But, in any view, we are unable to accept the accuracy of the statement; it seems clear that sufficient pressure might be and, in fact, was brought against the packing to cause it to burst.

We have, then, a confessed act of negligence on the part of the engineers, sufficient to account for the damage to libelant's cargo. All the witnesses who were present at the time, and are familiar with the facts, unite in saying that it was this fault which caused the leakage and that no ordinary joint could have withstood the pressure thus occasioned. The great weight of testimony is with the respondent upon this branch of the case, and the discussion might safely end at this point were it not for the libelant's contention that the joint was unseaworthy and that this condition contributed, in connection with the fault of management, to produce the damage.

Did the owners exercise due diligence to make the Albion seaworthy when she sailed? Was the joint properly packed? The carpenter who packed it appears to be an intelligent and competent person and he testified that it was tight, strong and perfect in every particular. No one else saw it and his testimony is wholly uncontradicted. After the joint was made it was tested by filling the tank and tipping the ship in various positions. The test showed no defect. This testimony is also uncontradicted.

The District Judge criticises this test for the reason that it does not satisfactorily show that the tank had been subjected to the amount of pressure which afterwards caused the leak. This seems to us hardly a fair criterion. The pressure which afterwards caused the leak was an abnormal and extraordinary pressure and one which the owners could not foresee and were not bound to guard against. If the manhole door were made in the usual way and withstood the ordinary tests it should be sufficient. The owners were not called upon to apply a strain to which, in a well-managed ship, it would never be subjected.

The accuracy of the tests at Java is also questioned by the libelant for various reasons, based upon assumptions not found in the record, but we are unable to accept these criticisms as well founded. It is true that all the details of the tests are not given, but if additional particulars were desired they could have been obtained on cross-examination. It is difficult to perceive what more the respondent could have done. No other test is suggested in the proofs. It is plain that no other test could be more effectual. If the tank withstood the pressure of ordinary filling nothing more was needed.

We do not feel justified in permitting the opinions of the experts to overthrow the direct and positive testimony that the joint was properly made and properly tested. If the tank had been filled in the usual

way there would be unquestioned force in the expert's theories, but when it appears that the treatment which the tank received might have destroyed a much better joint than the respondent was legally bound to furnish, the principal reason for accepting their opinions disappears. Having found a perfectly plain and adequate cause for the damage we are not required to resort to speculation and guesswork to find an additional cause. "The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport." The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241.

We think the Albion was reasonably fit to carry the libelant's sugar, and that she would have carried it safely had not the gross carelessness of her officers permitted the influx of seawater.

The decree is reversed with costs and the cause is remanded to the District Court with instructions to dismiss the libel with costs.