## UNITED STATES v. NEW YORK & O. S. S. CO., Limited.

### (Circuit Court of Appeals, Second Circuit. April 26, 1914.)

### No. 153.

1. **COURTS (§ 314*)—JURISDICTION OF FEDERAL COURTS—FOREIGN CORPORATION—CITIZENSHIP.**

A corporation organized under the laws of a foreign country is a citizen and resident of such country for the purposes of determining the jurisdiction of a federal court of a suit to which it is a party.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 860; Dec. Dig. § 314.*

Citizenship of corporation for purposes of federal jurisdiction, see notes to St. Louis, I. M. & S. Ry. Co. v. Newcom, 6 C. C. A. 174; Shipp v. Williams, 10 C. C. A. 249; Mason v. Dullagham, 27 C. C. A. 298.]

2. **UNITED STATES (§ 125*)—CONSENT TO BE SUED—HOW EVIDENCED.**

The United States cannot be sued either by a private individual or by a state without its consent, which must be evidenced by an act of Congress. Government officers cannot waive its privilege in that respect.

[Ed. Note.—For other cases, see United States, Cent. Dig. §§ 113, 114; Dec. Dig. § 125.*]

3. **COURTS (§ 17*)—"JURISDICTION."**

Jurisdiction of the subject-matter is the power to hear and determine cases of the general class to which the proceedings in question belong.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 46-50, 52; Dec. Dig. § 17.*

For other definitions, see Words and Phrases, vol. 4, pp. 3876-3885; vol. 8, pp. 7697, 7698.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**4. APPEARANCE (§ 19\*)—COURTS (§ 276\*)—JURISDICTION—EFFECT OF GENERAL APPEARANCE.**

While a general or voluntary appearance cannot confer jurisdiction over the subject-matter, it gives jurisdiction of the person of the defendant, and in the federal courts ordinarily is a waiver of the objection that suit is brought in the wrong district.

[Ed. Note.—For other cases, see Appearance, Cent. Dig. §§ 79-82, 84-90; Dec. Dig. § 19;\* Courts, Cent. Dig. § 815; Dec. Dig. § 276.\*]

**5. COURTS (§ 276\*)—UNITED STATES (§ 127\*)—SUITS AGAINST UNITED STATES—JURISDICTION UNDER TUCKER ACT—SUIT BY ALIEN.**

The general intention of Tucker Act March 3, 1887, c. 359, 24 Stat. 505 (U. S. Comp. St. 1901, p. 752), is to open the courts of the United States to all suits against the government, as respects the claims specified in the act, to aliens as well as citizens; and the requirement of section 5 that such suits shall be brought "in the district where the plaintiff resides," if applicable to suits by nonresident aliens or citizens residing abroad, is not jurisdictional, but confers a personal privilege which is waived by a general appearance by the law officers of the government.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 815; Dec. Dig. § 276;\* United States, Cent. Dig. § 116; Dec. Dig. § 127.\*]

**6. SHIPPING (§ 138\*)—LIABILITY FOR DAMAGE TO CARGO—HARTER ACT.**

Where there was a careful inspection of a vessel by the board of underwriters before a voyage commenced by which her seaworthiness was shown, the fact that she took in water during a heavy storm at sea is not proof of her unseaworthiness, and she is exonerated from liability for damages to cargo from such sea water under Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 (U. S. Comp. St. 1901, p. 2946).

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. § 138.\*]

**7. SHIPPING (§ 138\*)—LIABILITY FOR DAMAGE TO CARGO—FAULT IN MANAGEMENT OF SHIP.**

Where a vessel was inspected and found seaworthy at the commencement of a voyage, the fact that she was not again inspected at an intermediate port, which she reached after encountering a severe storm, if a fault, was one in the management of the ship, within Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 (U. S. Comp. St. 1901, p. 2946), and does not deprive the owner of the benefit of the exemption provided by such section.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. § 138.\*

Statutory exemptions of shipowners from liability, see notes to Nord-Deutscher Lloyd v. President, etc., of Insurance Co. of North America, 49 C. C. A. 11; Ralli v. New York & T. S. S. Co., 83 C. C. A. 294.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the New York & Oriental Steamship Company, Limited, against the United States. Decree for libelant, and respondent appeals. Affirmed.

The bill was brought in the old Circuit Court under the Tucker Act to recover $1,199.42 unpaid balance of hire earned by the transportation of certain government stores from New York to Manila in 1902 on board the petitioner's steamship Shimosa.

The petition was filed on November 5, 1906, after long negotiations with the government for the payment of the claim. On December 28, 1906, the United States attorney for the Southern district of New York filed a general appearance on behalf of the defendant.

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

A demurrer was filed based on two grounds: (1) That the petition did not state facts sufficient to constitute a cause of action. (2) That the court had not jurisdiction of the subject of the action. The demurrer was signed by the United States attorney without reservation as to the nature of his appearance. The first ground of the demurrer was not urged in the District Court or in this court. The demurrer was overruled; the opinion being reported in 202 Fed. 311. The government thereupon answered, and the case was tried on the merits; the court directing a decree for the full amount claimed. Findings of fact and conclusions of law were signed by the judge as required by the Tucker Act (Act March 3, 1887, c. 359, 24 Stat. 505 [U. S. Comp. St. 1901, p. 752]).

The assignments of error raise two questions: 1. The jurisdiction of the District Court. 2. The correctness of the findings that under section 3 of the Harter Act the steamship company was not liable for the damage admitted to have been sustained by the government's cargo during the voyage.

H. Snowden Marshall, U. S. Atty., of New York City (Addison S. Pratt, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Convers and Kirlin, of New York City (John M. Woolsey and Cletus Keating, both of New York City, of counsel), for appellee.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). [1] The petition alleges that the petitioner is "a corporation duly organized and existing under and by virtue of the laws of the United Kingdom of Great Britain and Ireland." A corporation is a citizen of the country or state by which it is incorporated, and it has its residence in such country or state and not elsewhere. In Shaw v. Quincy Mining Co. (1892) 145 U. S. 444, 450, 12 Sup. Ct. 935, 937 (36 L. Ed. 768), Mr. Justice Gray declared that:

"The legal existence, the home, the domicile, the habitat, the residence, the citizenship of the corporation can only be in the state by which it was created, although it may do business in other states whose laws permit it."

And in Insurance Company v. Francis (1870) 11 Wall. 210, 216 (20 L. Ed. 77), Mr. Justice Davis said:

"A corporation can have no legal existence outside the sovereignty by which it was created. Its place of residence is there, and can be nowhere else. Unlike a natural person, it cannot change its domicile at will, and, although it may be permitted to transact business where its charter does not operate, it cannot on that account acquire a residence there."

We must conclude, therefore, that this suit is brought by an alien and a resident of the United Kingdom of Great Britain and Ireland. This makes it necessary to consider the conditions under which an alien residing outside the United States can maintain an action against the United States.

[2] The United States cannot be sued either by a private individual or by a state without its consent. Louisiana v. Garfield, 211 U. S. 70, 29 Sup. Ct. 31, 53 L. Ed. 92; Kansas v. United States, 204 U. S. 331, 27 Sup. Ct. 388, 51 L. Ed. 510. And consent by the United States to be sued must be evidenced by an act of Congress. Stanley v. Schwalby, 162 U. S. 255, 16 Sup. Ct. 754, 40 L. Ed. 960; Hill v. United States, 9 How. 386. Government officers cannot waive the govern-

ment's privilege in this respect. Their consent that such a suit may be brought cannot bind the government of the United States. Carr v. United States, 98 U. S. 433, 25 L. Ed. 209.

Congress has made provision whereby under certain limitations suits may be brought against the government, in the courts of the United States, although no consent has ever been given that it may be sued in a state court in any case. Stanley v. Schwalby, supra. The question now presented to the court is whether any act of Congress authorized the District Court to assume jurisdiction of the case at bar.

In 1855 Congress created the Court of Claims (Act Feb. 24, 1855, c. 122, 10 Stat. L. 612, 614) and conferred upon it jurisdiction to hear and determine "all claims" of the character enumerated in the act. There was nothing in the act distinguishing claims by aliens from claims brought by citizens.

In 1863 Congress passed the Captured and Abandoned Property Act (Act March 12, 1863, c. 120, 12 Stat. L. 820, 821) which authorized "any person" who claimed as owner of any such property to prefer his claim for the proceeds thereof in the Court of Claims. Under this act it was held that aliens could file such claims, and the court appears to have been of the opinion that it had jurisdiction of any suit brought by an alien. Scharfer's Case, 4 Ct. Cl. 529, 532; Wagner's Case, 5 Ct. Cl. 637, 638.

In 1868 Congress forbade the bringing of any suit in any court by an alien under the Captured and Abandoned Property Act (Act July 27, 1868, c. 276, 15 St. L. 243). It contained, however, a provision that:

"This section shall not be construed so as to deprive aliens who are citizens or subjects of any government which accords to citizens of the United States the right to prosecute claims against such government in its courts, of the privilege of prosecuting claims against the United States in the Court of Claims, as now provided by law."

The Revised Statutes defining the jurisdiction of the Court of Claims provide as follows:

"Sec. 1059.—The Court of Claims shall have jurisdiction to hear and determine the following matters: First.—All claims founded upon any law of Congress, or upon any regulation of an Executive Department, or upon any contract, expressed or implied, with the government of the United States, and all claims which may be referred to it by either House of Congress. * * *" U. S. Comp. St. 1901, p. 734.

"Sec. 1068.—Aliens, who are citizens or subjects of any government which accords to citizens of the United States the right to prosecute claims against such government in its courts, shall have the privilege of prosecuting claims against the United States in the Court of Claims, whereof such court, by reason of their subject matter and character, might take jurisdiction." U. S. Comp. St. 1901, p. 740.

The Tucker Act, under which this suit was brought, was passed by Congress on March 3, 1887 (24 Stat. L. 505, 506). And the pertinent portions of that act are as follows:

"Sec. 1. That the Court of Claims shall have jurisdiction to hear and determine the following matters: First.—All claims founded upon the Constitution of the United States or any law of Congress, except for pensions, or upon any regulation of an Executive Department, or upon any contract, ex-

pressed or implied, with the government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect of which claims the party would be entitled to redress against the United States either in a court of law, equity or admiralty if the United States were suable. * * *

"Sec. 2. That the District Courts of the United States shall have concurrent jurisdiction with the Court of Claims as to all matters * * * in the preceding section where the amount of the claim does not exceed one thousand dollars, and the Circuit Courts of the United States shall have such concurrent jurisdiction in all cases where the amount of such claim exceeds one thousand dollars and does not exceed ten thousand dollars. * * *

"Sec. 4. That the jurisdiction of the respective courts of the United States proceeding under this act, including the right of exception and appeal, shall be governed by the law now in force, in so far as the same is applicable and not inconsistent with the provisions of this act. * * *

"Sec. 5. That the plaintiff in any suit brought under the provisions of the second section of this act shall file a petition, duly verified, with the clerk of the respective court having jurisdiction of the case, and in the district where the plaintiff resides. Such petition shall set forth the full name and residence of the plaintiff, the nature of his claim, and a succinct statement of the facts upon which the claim is based, the money or any other thing claimed, or the damages sought to be recovered and praying the court for a judgment or decree upon the facts and law.

"Sec. 6. That the plaintiff shall cause a copy of his petition filed under the preceding section to be served upon the district attorney of the United States in the district wherein the suit is brought, and shall mail a copy of the same, by registered letter, to the Attorney General of the United States, and shall thereupon cause to be filed with the clerk of the court wherein suit is instituted an affidavit of such service and the mailing of such letter. It shall be the duty of the district attorney upon whom service of petition is made as aforesaid to appear and defend the interests of the government in the suit, and within sixty days after the service of petition upon him, unless the time should be extended by order of the court made in the case to file a plea, answer, or demurrer on the part of the government, and to file a notice of any counterclaim, set-off, claim for damages, or other demand or defense whatsoever of the government in the premises: Provided, That should the district attorney neglect or refuse to file the plea, answer, demurrer, or defense, as required, the plaintiff may proceed with the case under such rules as the court may adopt in the premises; but the plaintiff shall not have judgment or decree for his claim, or any part thereof, unless he shall establish the same by proof satisfactory to the court."

The claim asserted by the libelant is for $1,199.42, and therefore it is claimed was within the provision of section 2 of the Tucker Act which gave the Circuit Courts concurrent jurisdiction with the Court of Claims in cases where the amount of such claim "exceeds one thousand dollars and does not exceed ten thousand dollars." This jurisdiction of the old Circuit Court was transferred to the District Court by the provisions of the Judicial Code, § 24, subd. 20 (Act March 3, 1911, c. 231, 36 Stat. 1093 [U. S. Comp. St. Supp. 1911, p. 138]).

But it is to be observed that under section 5 of the act it is provided that the plaintiff in any suit brought under section 2 must file his petition "in the district where the plaintiff resides." As we have seen, the plaintiff herein is a foreign corporation and has its residence nowhere in the United States. It nevertheless filed its petition in the Southern District of New York. It is conceded that under the acts of Congress the petitioner might have maintained the suit if it had been brought in the Court of Claims. But it is objected that the

216 F.—5

suit brought in the District Court cannot be maintained, as it has not been brought, as the Tucker Act requires, "in the district where the plaintiff resides." The court below (202 Fed. 311) sustained the petitioner's right to maintain the suit, and it did so upon the theory that the requirement as to bringing the suit "in the district where the plaintiff resides" does not go to the jurisdiction of the court, but is a privilege of exemption which the government can waive and in this case did waive when the district attorney put in a general appearance.

Whoever would institute proceedings against the United States "must bring his case within the authority of some act of Congress." Carr v. United States, supra.

Is the plaintiff in this suit able to show that this case is within the authority of any act of Congress? Unless it can show that the acts of Congress have conferred upon the court below the power to hear and determine the cause, its suit must fail and its petition be dismissed.

[3] In order that a court may hear and determine a controversy, it must have jurisdiction of the subject-matter and of the person. Jurisdiction of the subject-matter is the power to hear and determine cases of the general class to which the proceedings in question belong. In Cooper v. Reynolds, 10 Wall. 308, 316, 19 L. Ed. 931 (1870) Mr. Justice Miller defined jurisdiction over the subject-matter as follows:

"By jurisdiction over the subject-matter is meant the nature of the cause of action and of the relief sought; and this is conferred by the sovereign authority which organizes the court, and it is to be sought for in the general nature of its powers, or in authority specially conferred."

And counsel for the government in this case concedes that the claim sued upon is one of the class of claims against the United States over which the District and Circuit Courts are given jurisdiction by sections 1 and 2 of the Tucker Act, and that the District Court had jurisdiction of the subject-matter of this controversy. His contention is that the court below had no jurisdiction over the person, if it may be so called, of the United States, for the reason that the government had not consented to be sued by a nonresident alien in any Circuit Court, and that the District Court could not, therefore, acquire any jurisdiction over it by the service of process upon the United States Attorney, as required by section 6 of the act, or by his voluntary appearance. The plaintiff, on the other hand, contends that the general appearance by the United States Attorney, before any plea to the jurisdiction, constituted a waiver of any right which the United States might have had to claim that the petition could not properly be filed in the Southern District of New York.

[5] The question to be decided, therefore, is whether jurisdiction over the United States was obtained for the purposes of this suit by the general appearance of the United States attorney and before any plea to the jurisdiction was made.

Jurisdiction of the person is obtained, as Mr. Justice Miller said in Cooper v. Reynolds, supra, by the "service of process, or by the voluntary appearance of the party in the progress of the cause." Neither the Tucker Act nor any other act expressly authorizes a nonresident alien to commence a proceeding against the United States in

a District Court of the United States by a service of process upon the United States District Attorney or upon any other officer of the government. In Ribas y Higo v. United States, 194 U. S. 315, 322, 24 Sup. Ct. 727, 48 L. Ed. 994 (1904), the Supreme Court had its attention called to the question whether an alien nonresident could bring suit against the government in a District Court. But the court refrained from expressing any opinion. It said:

"The government insists that the requirement in that act, that the petition shall be filed 'in the district where the plaintiff resides' precludes a suit against the United States by any person, natural or corporate, residing out of the country. We express no opinion upon that question, as there are other grounds upon which we may satisfactorily rest our decision."

In Reid Wrecking Co. v. United States (D. C.) 202 Fed. 314 (1913) the question came before the District Court for the Northern District of Ohio, and it was held that section 5 of the Tucker Act, requiring that suits brought under the act should be commenced in the district where the plaintiff resides, was mandatory, and that a federal court in the district in which the plaintiff did not reside was without jurisdiction. But in the Reid Case there was no question of waiver involved. The United States District Attorney, disclaiming intention to enter an appearance, moved to quash the monition, the corporation being an alien and not a resident of the district. The District Judge in the course of his opinion alluded to the decision made in this case in the court below and distinguished it, saying:

"It is apparent, from an examination of that decision, that the United States government waived its rights to object to the suit being brought in that jurisdiction."

The court then went on to say of the cases then before it:

"Had the United States government waived the permissive requirements of the act and proceeded with the trial of these actions, a different question might be presented; but inasmuch as the United States attorney has made prompt objection to the prosecution of these suits in this jurisdiction, for the reasons stated in this memorandum, the motion in each case will be sustained."

The exact question presented upon the facts of this case appears to be one of first impression which must be decided according to the principles which seem to us applicable.

In the English courts, at least in some cases, jurisdiction over the subject-matter may be acquired by the proper officer of the government giving his consent thereto. In such cases the consent is given by the authority of the king who thus submits to be sued in his own courts. But in the United States no power exists in any officer of the federal government to confer jurisdiction over the subject-matter upon any of the federal courts. See The Davis, 10 Wall. 15, 20, 19 L. Ed. 875 (1869).

[4] We are compelled to inquire as to the effect which the general appearance of the United States District Attorney in this suit had upon the rights of the government of the United States. A general appearance cannot confer jurisdiction over the subject-matter of a suit for it is a fundamental principle of the law that consent of parties

cannot give to a court jurisdiction of the subject-matter, and it consequently follows that a general or voluntary appearance does not give jurisdiction of the subject matter. Creighton v. Kerr, 20 Wall. 8, 22 L. Ed. 309; Wheelock v. Lee, 74 N. Y. 495; Osgood v. Thurston, 23 Pick. (Mass.) 110; 200,000 Feet Logs v. Sias, 43 Mich. 356, 5 N. W. 414; State v. Manitowoc, 92 Wis. 546, 66 N. W. 702.

But a general or voluntary appearance is regarded as equivalent to service of process. Hill v. Mendenhall, 21 Wall. 453, 22 L. Ed. 616; Reed v. Chilson, 142 N. Y. 152, 36 N. E. 884; North Hudson County R. Co. v. Flanagan, 57 N. J. Law, 696, 32 Atl. 216; Chicago, etc., R. Co. v. Hitchcock County, 60 Neb. 722, 84 N. W. 97. A general appearance, therefore, under ordinary conditions is held to confer jurisdiction of the person on the court; the defendant being estopped to object for want of such jurisdiction. Pennoyer v. Neff, 95 U. S. 714, 24 L. Ed. 565; Cooper v. Reynolds, 10 Wall. 308, 19 L. Ed. 931; Rothschild v. Knight, 176 Mass. 48, 57 N. E. 337; Matter of McLean, 138 N. Y. 158, 33 N. E. 821, 20 L. R. A. 389; Fowler v. Bishop, 32 Conn. 199. And in the federal courts a general appearance ordinarily waives the objection that suit is brought in the wrong district—as where the defendant is sued in a district other than where he resides or is found. St. Louis, etc., R. Co. v. McBride, 141 U. S. 127, 11 Sup. Ct. 982, 35 L. Ed. 659; Toland v. Sprague, 12 Pet. 300, 9 L. Ed. 1093; Kelsey v. Pennsylvania R. Co., 14 Blatchf. 89, Fed. Cas. No. 7,679.

In suits brought by an alien against a citizen but in a district other than that "of which he is an inhabitant," it has been held that if the defendant enters a general appearance and pleads to the merits he thereby waives his right subsequently to object that he has been sued in the wrong district. Betzoldt v. American Insurance Company (C. C.) 47 Fed. 705; Iowa Lillooet Gold Mining Co. v. Bliss (C. C.) 144 Fed. 446. These cases proceed upon the theory that the requirement that the suit shall be brought in the district of residence is not a jurisdictional requirement but a personal privilege or exemption.

In Barrow Steamship Co. v. Kane (1898) 170 U. S. 100, 112, 18 Sup. Ct. 526, 530 (42 L. Ed. 964), the Supreme Court in speaking of the act of Congress defining the jurisdiction of the Circuit Courts of the United States said:

"And, as has been adjudged by this court, the subsequent provisions of the act, as to the district in which suits must be brought, have no application to a suit against an alien or a foreign corporation; but such a person or corporation may be sued by a citizen of a state of the Union in any district in which valid service can be made upon the defendant."

In Re Louisville Underwriters, 134 U. S. 488, 10 Sup. Ct. 587, 33 L. Ed. 991 (1890), the court made a like ruling in an admiralty suit. In Re Hohorst, 150 U. S. 653, 14 Sup. Ct. 221, 37 L. Ed. 1211 (1893), a like ruling was made in a suit for an infringement of a patent. In the latter case the court alluding to the provision above referred to said:

"The words of that provision, as it now stands upon the statute book, are that 'no civil suit shall be brought before either of said courts against any

person by any original process or proceeding in any other district than that whereof he is an inhabitant.' ⸢These words evidently look to those persons, and those persons only, who are inhabitants of some district within the United States. Their object is to distribute among the particular districts the general jurisdiction fully and clearly granted in the earlier part of the same section; and not to wholly annul or defeat that jurisdiction over any case comprehended in the grant. To construe the provision as applicable to all suits between a citizen and an alien would leave the courts of the United States open to aliens against citizens, and close them to citizens against aliens. Such a construction is not required by the language of the provision, and would be inconsistent with the general intent of the section as a whole."

It seems to us clear that the general intent of the Tucker Act is to open the courts of the United States to suits against the government as respects the claims specified in that act and that the intention was that they should be open to aliens as well as to citizens. And it may be that the provision which requires suits to be brought in the district where the plaintiff resides is applicable only to aliens and citizens residing in the United States and that persons residing outside the United States may bring suit in any district. But we do not find it necessary to express any opinion upon that question. In our opinion if the provision which requires the plaintiff to bring suit in the district in which he resides is applicable to nonresident aliens and to citizens residing abroad, nevertheless the requirement is a personal privilege which the law officers of the government may waive and in this case did waive by putting in a general appearance. In Farrar & Brown v. United States, 3 Pet. 459, 7 L. Ed. 741, Chief Justice Marshall held that the Attorney General of the United States by a general appearance cured any defect in the service of process on the United States, and that the general rule that such an appearance cured a defect in process was applicable to the United States as well as to any private litigant.

Having reached the conclusion that the court below had jurisdiction under the circumstances to hear and determine the issue we pass to the consideration of the government's contention that the court below erred in the conclusion it reached upon the merits.

The petition was filed November 5, 1906, four years after the steamship company had performed the service for which it now seeks to recover. The delay in its suit is accounted for in part by the fact that there were long negotiations with the government looking to a settlement of the claim. During these negotiations the government asked to have the original papers in the case filed with it which was done. The officers of the government afterwards, it is claimed by the petitioner, refused to return these papers to the petitioner, and in consequence of this arbitrary attitude of the government's officials it was made exceedingly difficult to get sufficient facts together to make it possible to draw up the petition. We are quite unable to understand what justification there can possibly be for what seems to us exceedingly reprehensible conduct. When the government decided to refuse to pay the claim the papers upon which the claim was based and which had been turned over to it at its request by the claimant ought to have been promptly returned and not arbitrarily withheld to the serious embarrassment of the petitioner.

The agreement entered into by the petitioner and the government was for the transportation of merchandise from New York to Manila; the government agreeing to pay freight on delivery at Manila in the sum of $5,985.21. The amount actually paid was $4,786.99. The balance was withheld on the ground that a large quantity of the merchandise was seriously damaged as the result of sea water which had come in contact with it during the voyage. This was due, the government claimed, to the failure of the petitioner to exercise due diligence to make the steamship in all respects seaworthy and properly equipped and supplied prior to her departure from New York.

The court below in its findings of fact found that:

The owners of the vessel "had exercised due diligence to make her in all respects seaworthy and properly manned, equipped, and supplied and that she was in fact seaworthy and in all respects properly manned, equipped, and supplied when the cargo referred to was loaded on board of her and when she sailed from the port of New York on her voyage aforesaid. The defendant's cargo was properly stowed and dunnaged."

The court also found as a fact that during the voyage the vessel encountered a hurricane of great severity during which she shipped heavy seas fore and aft, and that the storm caused considerable damage about the decks, "and also strained, started or bent two deadlights or ports in the way of No. 3 hatch, so that sea water was admitted into the cargo apartments through the deadlights or ports which had thus been strained. The sea water so admitted caused damage to the defendant's cargo."

It was also found:

"That the cargo in respect of which the government claims damage in this case was stowed across the ship at No. 3 hatch and that the damage suffered by the cargo was caused by sea water admitted to the vessel through the strained ports or deadlights hereinabove referred to and was a damage arising from the dangers of the seas."

In its conclusions of law the court found that the provisions of the Harter Act were applicable. It also found:

"That the petitioner and the steamship Shimosa performed all the duties and obligations laid on the said steamship or the petitioner in respect of the transportation, loading, stowage, custody, care, and delivery of the defendant's cargo."

The government's contention in this court is that these findings of fact and of law were erroneous.

The evidence satisfies us that the vessel was in all respects seaworthy when the voyage commenced. She was a new ship and started on her first voyage in January, 1902, being rated at Lloyd's 100 A–1, which is the highest class in Lloyd's Registry. She was carefully inspected and found all right before she left New York. The government introduced no testimony on the subject of the condition of the ship when she started on her voyage, and the testimony of the petitioner is unchallenged that she was at that time seaworthy and that her ports were in proper condition and were properly closed and were water tight. A due and proper inspection had been made and everything was found to be right.

[6] The decisions under the Harter Act have uniformly held that on evidence of careful inspection of a vessel before the voyage commenced, by which her seaworthiness is shown, the fact that she may have taken in water during a heavy storm at sea is no proof of unseaworthiness, but that on proper proof of seaworthiness on sailing she is entitled to the exoneration provided for by the third section of the act. The Wildcroft, 201 U. S. 378, 26 Sup. Ct. 467, 50 L. Ed. 794 (1905); The Silvia, 171 U. S. 462, 466, 19 Sup. Ct. 7, 43 L. Ed. 241 (1898); The F. & T. Lupton (D. C.) 182 Fed. 144 (1910); Bradley v. Lehigh Valley R. Co., 153 Fed. 350, 82 C. C. A. 426 (1907); American Sugar Refining Co. v. Rickinson Sons & Co., 124 Fed. 188, 59 C. C. A. 604 (1903); The Hyades (D. C.) 118 Fed. 85 (1902); The Tjomo (D. C.) 115 Fed. 919 (1902); The British King (D. C.) 89 Fed. 872 (1898).

The vessel had been inspected by the Board of Underwriters at New York when the loading was completed and a certificate was given by the surveyors. The evidence showed that the cargo was stowed in the usual and customary manner and was properly dunnaged. None of the cargo in hatches Nos. 1, 2, and 4 was damaged. But some of the government's cargo in hatch No. 3 and some of the cargo in hatch No. 5 were injured by sea water.

The chief officer of the vessel was asked what caused the damage to the cargo, and answered:

"The ports being strained through violent lurching and straining of the ship in the heavy weather."

He testified that when the ship reached Manila:

"We found after the cargo was discharged, and we went to look for the cause of the water, we found the ports strained, strained out of shape and the water had got in that way."

He also testified that, although his experience at sea had extended over 23 or 24 years, he did not know he had ever encountered a worse storm than the one encountered on this voyage.

[7] But the government also contends that the petitioner is not relieved by the provisions of the Harter Act for the reason that the cargo was not properly cared for during the voyage. It seems that the ship on its way to Manila reached Algiers on November 12th which was subsequent to the storm which the vessel had encountered, and that she stopped there about 36 hours taking on coal. It was discovered after the storm was over that water had entered No. 2 bilge, and also No. 4 bilge and the pumps were at once set to work and the water was pumped out. It was not known that any water had drained into No. 3 hatch where the government cargo was stowed. When the ship reached Manila it was discovered that the storm had strained some of the hatches, and among others hatch No. 3, and that sea water had entered and damaged the government's merchandise. The government complains because while the ship was at Algiers no inspection was made to discover whether water had entered hatch No. 3, or to determine at what point the water found in the bilges had entered. But it seems to us that, the vessel being seaworthy when she began her voy-

age, the failure to make the inspection at an intermediate port, if such an inspection ought to have been made, must be regarded as a fault in management of the ship under the third section of the Harter Act. The Guadeloupe (D. C.) 92 Fed. 670 (1899). That act provides that if the owner of any vessel transporting merchandise to or from any port in the United States exercises due diligence to make the vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner, agent, or charterer shall become or be held responsible for damage or loss resulting from faults or errors of navigation or in the management of said vessel. The act was "intended to relieve the shipowner who has done all that he can do to start off a well-fitted expedition, from liability for damages caused by faults or errors of his shipmen after his ship has gone below the horizon and away from his personal observation." Benedict's Admiralty, § 229. The master of the vessel testified that those in command of the ship had no knowledge that some of the ports had been leaking until they reached Manila, and that as soon as they reached Hong Kong they had a thorough examination made by the surveyors. He was asked:

"But you made no other effort, prior to getting to Hong Kong, to see what had caused the damage?"

He answered:

"No, there was no need to. We found no water in our limbers and there was no cargo damaged from it."

We are entirely satisfied that the injury to the merchandise belonging to the government was a damage arising from the dangers of the sea and that the petitioner and the steamship performed all the duties and obligations resting upon them in respect of the transportation, loading, stowage, custody, care, and delivery of the defendant's cargo.

Decree affirmed.